**GRISWOLD** REAL ESTATE MANAGEMENT

Griswold Corporate Center
5703 Oberlin Drive, Suite 300
San Diego, CA 92121-1743
858-597-6100
Fax 858-597-6161

May 23, 2005

Michael K. Livingston, Esquire
Davis, Levin, Livingston & Grande
851 Fort Street
Honolulu, HI 96813
(800) 800-0752, Fax: (808) 545-7802

Re: Romero v. Lowe

Dear Mr. Livingston,

Pursuant to the federal disclosure rules for expert witnesses, please accept this letter as the required disclosure for my expert testimony that I anticipate giving in the above matter.

To simplify the required disclosure, I have followed the language contained in Rule 26 of the Federal Rules of Civil Procedure and provided the required information in the same order.

<u>Statement of all opinions to be expressed and the basis and reasons therefore:</u>

I have been asked to use my knowledge and expertise in the field of residential property management to examine the events that lead to Lisa Romero's fall through the hole surrounding the fireman's pole sometime during the early morning hours on January 1, 2003.

More specifically, my understanding of the scope of my testimony is to identify those standards and practices in the area of residential property management that are applicable to the conduct of the landlords of the 111 Hauoli St. property, Jeffrey and Linda Lowe, and to render any opinions that I have regarding the breach of those standards.

This includes a review of the background and experience of the Lowes, plus their rental policies and procedures and practices concerning the preparation and marketing of the subject property, specifically as to the condition of the rental property at the time they entered into the subject lease with the Seversen tenant group and as to whether those said items meet the rental housing industry standard of care for residential properties.

Said policies and procedures and practices include, but are not limited to, the actions and inactions of the Lowes as it pertains to the fireman's pole, the spa and the spiral staircase. Said review was undertaken with a specific emphasis on the potential danger of these property features to the tenants and their guests and invitees.

EXHIBIT C

FAX TRANSMITTED / RECEIVED

Date: 5/23/05
Time: 3:27 p.m.
Initials: ___

Michael K. Livingston, Esquire
Davis, Levin, Livingston & Grande
May 23, 2005
Page 2

Specific opinions include:

1) The Lowes were both licensed real estate brokers in California. Linda Lowe has been licensed as a California broker since 4/19/89 and her license is current (expires 2/22/06) with a main office address of 1908 Dover Drive, Newport Beach, CA. Jeffrey Alan Lowe initially obtained his California broker's license a day after his wife on 4/20/89 but allowed his license to lapse as of 4/19/01. Linda Lowe is an attorney. Jeffrey Lowe has an MBA and is experienced in property management. The Lowes have owned and managed single family residential rental properties for many years. At the time of Ms. Romero's fall, they were acting as residential property landlords and managers for the subject property and other properties in Hawaii. As such, they had or should have had an understanding of the basic responsibilities, duties, standards and practices related to the management of residential property, such as the 111 Hauoli Street premises.

2) An extremely important consideration and responsibility that a landlord has is to ensure that the rental property is safe and habitable for the tenants. While the landlord may only have limited access during the tenancy, they have full access and control of the property before entering into a tenancy. In this instance, the Lowes had recently purchased the 111 Hauoli Street premises, after conducting their due diligence of the property, including the use of a professional home inspection company. They had the opportunity to thoroughly investigate the condition of the interior and exterior of the property. The sellers, the Kotts, provided an extremely comprehensive disclosure statement that outlined in detail the limitations and concerns with the property. This included, but was not limited to, the fact that the fireman's pole and the spiral staircase were installed in the premises by the Kotts but were not permitted prior to their construction. Jeffrey and Linda Lowe fully acknowledge that they were aware of the lack of permits for these architectural features of the property and even had specific conversations with the Kotts. Although the Lowes knew that the fireman's pole was "not permitted," they did not determine whether the fireman's pole was an allowable architectural element, or whether it was code complaint. Specifically, Jeffrey Lowe apparently made no inquiry regarding the fireman's pole in connection with the home inspection and was unable to understand the documents he obtained from the local building department.

3) As the landlord and property manager for the subject premises, the Lowes had a continuing obligation to respond to the tenants complaints and concerns about the property. These complaints included complaints about the spa, the refrigerator, the hot water heater, and the upstairs bathroom, and the Lowes made several visits to the property to make the requested repairs or to deliver documents. They also visited the property in connection with their management of the separate rental cottage, and to manage the grounds (e.g., to pick mangos, to manage lawn care, to repair the sprinkler system, and to deal with rubbish). The Lowes maintained a key to the premises and had authorization from the Seversen tenant group to enter the property as needed to make the requested repairs and/or deliver

Michael K. Livingston, Esquire
Davis, Levin, Livingston & Grande
May 23, 2005
Page 3

documents. Because the fireman's pole and spiral staircase were such unique architectural features with known potential for being a hazard, the Lowes had a responsibility to make visual inspections of same during their property visits to the interior of the unit. This entry into the premises also included unfettered access to the cottage storage where ultimately the railing that surrounded the fireman's pole was placed by the Seversen tenant group. The Lowes used this storage area continuously during the Seversen tenancy for their own personal use including the storage of tools and equipment for grounds maintenance.

There are several levels on which this duty operates: the statutory level; the contractual level; and the professional level.

4) As a landlord and/or a property manager, there are standards of care for owning, operating and managing residential rental property. There are also responsibilities to comply with federal, state and local laws, codes and regulations. In Hawaii, the residential landlord and property manager has a responsibility to comply with the state's residential landlord-tenant laws.

- Hawaii has a law requiring that the landlord ensure that the rental premises are in compliance with all building and health codes related to safety. HRS § 521-42 includes the following provisions:

    "(a) The landlord shall at all times during the tenancy:
    (1) Comply with all applicable building and housing laws materially affecting health and safety; . . .
    (3) Make all repairs and arrangements necessary to put and keep the premises in a habitable condition. . . ."

    The landlord's obligations under § 521-42(a)(1) are non-delegable under subparagraph (b)(2).

- A landlord and/or property manager may not lawfully rent a residential property that in not in compliance with building codes affecting health and safety, even with full disclosure and assumption of risk by the tenants. This is a matter of public policy, for which there are good reasons. It is apparent that the Lowes were well aware of these statutory provisions, for they cite to Chapter 521 in numerous places in the Residential Lease Agreement. Jeffrey Lowe testified in his deposition that he had developed the customized residential lease form himself by reviewing similar documents that he had previously used and by adding language after reviewing the Hawaii tenant-landlord laws in Chapter 521.

Michael K. Livingston, Esquire
Davis, Levin, Livingston & Grande
May 23, 2005
Page 4

5) The residential landlord and property manager has a responsibility to comply with the terms of the lease contract. This specific lease included:

- Under clause 12, a provision under the heading "Maintenance Responsibilities", that required the cotenants, at all times during the tenancy, to "Comply with all applicable building and housing laws materially affecting health and safety." Yet, as indicated above, the landlord has a non-delegable duty to ensure that the premises "comply with all applicable building and housing laws materially affecting health and safety" throughout the tenancy.

6) As indicated above, one of the most important aspects of being a residential landlord and/or property manager is the responsibility to ensure that there are no hazards associated with the rental property that pose an unreasonable risk to the tenants or to visitors to the premises.

- There is no question that the Lowes, as landlords engaged in the management of their own rental residential property, had a professional obligation to exercise reasonable care to ensure that the rental property was not unreasonably dangerous to their tenants or to visitors to the premises.

- It is of course unrealistic and unnecessary that a landlord remove every conceivable hazard associated with a particular rental property. Indeed, many important, or even essential components of a residential property may be hazardous. Every residential property has at least some and would not even be habitable if they didn't. For example, electricity, stairways, balconies, hot water heaters, and glass doors. Then there are many that may not be required for basic habitability, but are features that enhance the use and desirability of a given property, such as swimming pools and spas, electric garage doors, play structures, trees and landscaping, etc.

- In the case of many common constituent elements of a residential property that are potentially hazardous, there are safety codes that establish minimum safety standards. For example, using the examples set out above: there are numerous safety codes and standards related to a home's electrical system; there are safety codes and standards related to swimming pools and spas, including a requirement that pools and spas more than 18 inches deep be completely surrounded by a fence, wall or other enclosure that is at least 54 inches in height; there are building codes that include safety requirements for stairways and balconies, including codes and standards that require, as a minimum, 36 – 42 inch high guard rails for balconies over drops of 30 inches or more; there are building codes that include safety requirement for tempered or shatterproof glass in sliding glass doors and areas within 5' of an open drain, such as shower doors; and there are building codes that include requirements for automatic reversing

Michael K. Livingston, Esquire
Davis, Levin, Livingston & Grande
May 23, 2005
Page 5

mechanisms for electric garage door openers and closers. These are among the "building and housing laws materially affecting health and safety" as to which landlords have a non-delegable duty of compliance throughout the lease term.

- As indicated above, a residential landlord and/or property manager has a duty to inspect the property prior to its rental in order to ensure that it is in compliance with all building and housing laws materially affecting safety. Yet a landlord's duties and responsibilities do not stop there. In connection with the landlord's responsibility to inspect the premises, the landlord must take reasonable and appropriate steps to identify every potential hazard, regardless of whether it is subject to a building or housing law affecting safety.

- Once a potential hazard is identified, the landlord must exercise reasonable and appropriate judgment to determine what measures, if any, should be taken to eliminate the hazard, or to guard or warn against it if it cannot be eliminated. In exercising this judgment, the landlord should evaluate the gravity of the potential hazard, the utility of the property element containing the potential hazard, the difficulty and cost of eliminating the potential hazard, the availability and efficacy of guarding devices to protect against the potential hazard, and the capacity to provide effective warnings against the potential hazard. It is self-evident that elimination of a potential hazard is the safest course of action, and is far superior to guarding and warning in preventing injuries or death. Accordingly, if a serious potential hazard has little or no utility, it must be eliminated if possible.

If the potential hazard has sufficient utility that the landlord concludes it cannot reasonably be eliminated altogether, the landlord must do everything reasonably possible to guard against the potential hazard. The following examples are illustrations of the application of these considerations: termite infested trees that are in danger of falling must be removed; play structures that have dangerous attributes, such as corroded connections, jagged or sharp edges, pinching joints, or concrete fall zones, must be eliminated; diving boards and slides into swimming pools that are not sufficiently deep or wide must be removed; wrought iron balcony and/or stairway guard rails that are corroded or otherwise in jeopardy of failure must be replaced; structural supports within buildings which have been weakened by termite infestations or dry rot, or which are otherwise in jeopardy of failure, must be repaired. Only as a last resort, where a potential hazard has substantial utility and adequate safeguarding is not feasible, should a landlord resort to simply warning against the hazard.



Michael K. Livingston, Esquire
Davis, Levin, Livingston & Grande
May 23, 2005
Page 6

- The standard that the landlord must apply is not whether the potential hazard would be acceptable if the landlord choose to reside in the premises rather than rent the premises. The reason for this is obvious. First, the landlord has no way to monitor the potential hazard on a continuing basis, as he/she would if residing within the premises. Second, although the landlord has a limited interaction with the tenants through which the landlord can communicate a warning, the landlord has no reliable way of communicating directly with guests of the tenants or other visitors to the premises. Third, the landlord must assume that those who may be exposed to the potential hazard will include people with little understanding of the nature or extent of the danger, or who may disregard, misunderstand or forget warnings, including children and adults of limited experience.

7) Applying the preceding principles and considerations to this case, it is clear that the Lowes should have eliminated the potential hazard posed by the fireman's pole prior to placing the premises on the rental market.

Having purchased the home in "as is" condition, the Lowes had an enhanced duty to inspect the premises for potential hazards. And because the real property disclosure by the prior owner specifically informed the Lowes that the fireman's pole was "not permitted," they had a responsibility to inspect the fireman's pole to determine if it was in compliance with applicable codes. This is not something that the Lowes reasonably could ignore. The fireman's pole constituted both a unique architectural feature that could not escape notice, and an obvious potential hazard, even with the guard rail. Indeed, the Lowes included a provision in the Residential Lease Agreement explicitly acknowledging that the fireman's pole was a "unique and possibly hazardous architectural feature." Having appropriately identified the fireman's pole as a potential hazard, even with the guard rail in place, the Lowes should have recognized immediately that the fireman's pole had absolutely no utility except as a recreational device, that the use of the fireman's pole as a recreational device was inherently dangerous, that the danger associated with the fireman's pole was extreme (involving the risk of serious injury or death), and that the potential hazard could be eliminated without unreasonable cost or difficulty. Actually, the fireman's pole should have been understood by the Lowes to be an undesirable, adverse architectural feature, given the fact that it allowed sound and light to move between the master bedroom and the living room, and represented a potential fire hazard. In short, the Lowes should have concluded immediately that the hole for the fireman's pole should be permanently sealed (with or without the removal of the fireman's pole itself), prior to renting the premises.

Michael K. Livingston, Esquire
Davis, Levin, Livingston & Grande
May 23, 2005
Page 7

8) The Lowes also should have determined through their inspection of the premises that the guard rail surrounding the fireman's pole did not comply with the Uniform Building Code minimum height requirement for guard rails inside residential properties such as the 111 Hauoli St. main house. As discussed above, the Lowes should have been aware of the building code's safety provisions, and definitely should have inspected the rental premises to ensure compliance with those standards. It appears that the Lowes did not determine that the guard rail was not in compliance with the building laws.

- Had the Lowes determined that the guard rail was less than 36 inches in height, and therefore was not in compliance with the building code, they would have been faced with the decision of whether to close off the hole surrounding the fireman's pole or bring the guard rail into compliance with the building code. The only reasonable and responsible course of action under the circumstances was to close off the hole. This is because the fireman's pole had little or no utility (and actually was an undesirable architectural feature), the potential hazard was extreme, and the cost and difficulty of elimination of the hole was not unreasonable. Moreover, it should have been (and apparently was) obvious to the Lowes that the installation of a code-compliant guard rail would not adequately protect against the potential hazard. Indeed, this is presumably the reason the Lowes included clause 19 in the Residential Lease Agreement. Among the reasons that a guard rail was not a sufficient precaution are these: children might open the gate or climb over the railing; tenants or their guests might play on the fireman's pole; the gate might be left open; someone might fall over the railing at night; or the railing might be removed by the tenants. In fact, the only reason not to close off the hole, and instead to utilize a guard rail as a protective barrier, would be to make the fireman's pole available to the tenants and visitors to the premises as an inherently dangerous recreational device.

9) The provision in the Residential Lease Agreement specifying that the "Tenant acknowledges that the 'fireman's pole' is "a unique and possibly hazardous architectural feature of the property, and therefore agrees not to use it except at his own risk," is inappropriate from a property management perspective. This is true for several reasons. First, it appears to violate the prohibition in Hawaii's Residential Landlord-Tenant Code against inclusion in a rental agreement of a provision "exempting the landlord . . . from liability for damages to persons or property caused by or resulting from the acts or omissions of the landlord . . ." HRS § 521-33. Second, it does little to eliminate the hazard. It is actually an explicit authorization to use the fireman's pole despite the hazard. Although it does provide some degree of warning to the cotenants regarding the danger, it does nothing to warn guests of the tenants or other visitors to the premises.

Perhaps even more troubling is the likelihood that this lease provision may have been interpreted by the tenants as an implicit authorization to remove the guard rail, insofar as they may have felt that they already had assumed the risks associated with the hazard.

Michael K. Livingston, Esquire
Davis, Levin, Livingston & Grande
May 23, 2005
Page 8

10) The Lowes took steps, as landlords, to protect themselves against liability for injuries or deaths arising out of the known hazard associated with the fireman's pole, at the expense of their tenants, their tenant's guests, and other visitors to the premises. Specifically, they included in the Residential Lease Agreement a provision that appears to have been intended to shift liability away from the landlords and onto the tenants for any injury from a fall through the fireman's pole hole.

11) The Lowes, as landlords, had a responsibility to exercise reasonable care to monitor and inspect the leased premises throughout the term of the tenancy. Again, this responsibility has several bases.

- First, it is grounded in the statutory provisions discussed above, imposing the non-delegable duty to comply with all building and health laws materially affecting safety throughout the tenancy. Hawaii law guarantees the landlord's right of access to the leased premises. HRS § 521-53.

  Second, it is grounded in the Residential Lease Agreement, which includes clause 15, a provision establishing the landlord's right to access. This clause provides that "Landlord or Landlord's agents may enter the premises in the event of an emergency, to make repairs, decorations, alterations, or improvements, or to show the premises to prospective buyers, tenants, mortgagees, inspectors, or contractors. Landlord may also enter the premises to conduct periodic inspections to check for adequate cleaning and maintenance of the premises by Tenant." The Lease also includes clause 11 which prohibits altering or re-keying of any of the locks or installing or altering the burglar alarm system without prior written consent of the landlord and without insuring the landlord retains full access to the premises. If the tenants expect to be away from the premises for seven or more consecutive days, the Lease provides in clause 16 that "During such absences, Landlord may enter the premises at times reasonably necessary to maintain the property and inspect for needed repairs."

  Third, it is grounded in professional responsibilities. As discussed above, the landlord has a continuing responsibility to ensure that the rental premises are safe and habitable.

12) It is also significant that the leased premises were limited to the "main house," and did not include the enclosed storage area in the carport area, or the rental cottage also located on the property. It does not appear that the storage shed, or garage, was leased to either the tenants of the main house, or the tenants of the cottage. Nonetheless, the landlord and tenants of both the main house and cottage stored things in the shed. Accordingly, the storage shed was what is commonly referred to as a common area, which is the responsibility of the landlord to supervise and maintain.

Michael K. Livingston, Esquire
Davis, Levin, Livingston & Grande
May 23, 2005
Page 9

13) The question of whether the Lowes should have known that the guard rails had been removed prior to Ms. Romero's fall cannot be definitively answered from a property management perspective. However, while I am not an attorney, I am aware of the basic concepts surrounding issues of notice. In this matter, there are specific code sections that have been brought to my attention and the following comments are relevant to this question.  First, the Hawaii's residential landlord-tenant code includes a statutory provision establishing that a person has notice of a fact when "(1) the person has actual knowledge of it; or (2) the person has received a notice or notification of it; or (3) from all the facts and circumstances known to the person at the time in question the person has reason to know of it." HRS § 521-9(a).  If the Lowes were in a position to observe either the fireman's pole with the railing removed, or the railings after they had been removed, during the approximately two months from the time that the railing was removed until Ms. Romero's fall, the Lowes immediately should have inquired of the tenants or used their right of entry to determine whether the railing had been removed and whether appropriate precautions had been taken with respect to the hazard.

14) In summary, the Lowes knew or should have known that: (1) the fire pole hole was dangerous, even with the guard rail; (2) the fireman's pole was not permitted; (3) the guard rail surrounding the fireman's pole was not in compliance with the Building Code; (4) it was unlawful to place the house on the rental market with the non-compliant and non-permitted fireman's pole and hole; (5) the foreseeable risk of falling through the fire pole hole involved a risk of death or serious injury; (6) the fireman's pole had not utility except as an inherently dangerous recreational device; (7) the fireman's pole was an undesirable architectural feature; and (8) it would have been "easy" to remove the fireman's pole and seal the hole.  Accordingly, the Lowes acted imprudently by placing on the rental market a house that included an unreasonably dangerous architectural feature.  The fire pole hole should have been sealed off before the house was leased.

15) The Lowes failure to exercise reasonable and appropriate care in connection with their rental of the Hauoli St. house is also plainly reflected in their handling of the spa.  As with the fireman's pole, the Lowes were on notice that the spa was "not permitted," and they knew that it was potentially hazardous.  The danger of an electrical problem associated with the spa should have been of particular concern to the Lowes, insofar as they were on notice of just such a problem and the risk associated with an electrical hazard was death or serious injury. Nonetheless, the Lowes rented the house without repairing or removing the spa.  As with the fireman's pole, they simply included a provision in the Residential Lease Agreement intended to protect themselves from liability in the event someone was killed or injured while using the spa.  When they eventually had an electrician look at the spa, the electrical hazard was confirmed.

Michael K. Livingston, Esquire
Davis, Levin, Livingston & Grande
May 23, 2005
Page 10

I also reserve the right to express additional opinions or rebut the positions of other experts after reviewing their preliminary Rule 26 opinions.

<u>The data or other information considered by this witness in forming the opinions:</u>

I have reviewed the following pleadings:

> Complaint; Demand for Jury Trial; Summons to Answer Civil Complaint

> Residential Lease Agreement for 111 Hauoli Street, Kailua, HI dated 4/9/01 between Jeffrey and Linda Lowe and Matthew Ray Severson, Benjamin Allen Wilder, Mindy Wilder, and George Klaus III

> Amendment of Residential Lease Agreement

> Defendant and Third-party Plaintiff Linda Lowe's Response to Plaintiff's First Request for Answers to Interrogatories to Defendant and Third-party Plaintiff Linda Lowe Dated 03/03/2005

> Defendant and Third-party Plaintiff Jeffrey Lowe's Response to Plaintiff's First Request for Answers to Interrogatories to Defendant and Third-party Plaintiff Jeffrey Lowe Dated 03/03/2005

> Seller's (Kott's) Real Property Disclosure Statement

> 111 Hauoli Street due diligence inspection report by Raymond Fong of Certified Home Inspection Service

> Warranty Deed from Kotts to Lowes

> Numerous exterior and interior laser color photos of 111 Hauoli Street

> Photos of fire pole (upstairs and downstairs)

> Recorded interview of Jeffrey Lowe by insurance investigator

> Copy of California real estate sales license wallet card for Jeffrey Lowe – Expired 4/19/01

> Copy of California real estate broker license for Linda Lowe – expires 2/22/06

Michael K. Livingston, Esquire
Davis, Levin, Livingston & Grande
May 23, 2005
Page 11

Report prepared by Richard Gill, Ph.D., CHFP, CXLT of Applied Cognitive
Sciences

Hawaii Revised Statutes Annotated – Chapter 521


I have reviewed the following depositions (in alphabetical order):

Deposition transcript of Jeffrey Lowe
Deposition transcript of Linda Lowe
Deposition transcript of Lisa Romero, Volume I + exhibits
Deposition transcript of Lisa Romero, Volume II + exhibits


In addition, I have utilized my extensive education, training and experience in the management and
acquisition due diligence of residential income real estate.


Any exhibits to be used as a summary of or support for the opinions:

All of the materials reviewed in the listing above for "data or other information considered by this
witness in forming the opinions", plus rental housing industry widely-accepted and easy to obtain
publications and materials concerning fair housing, including, but not limited to, *Property
Management for Dummies.*


The qualifications of the witness, including a list of all publications authored by the witness within the
last ten years:

I have attached a copy of my curriculum vitae which indicates my qualifications.

I have authored two books and a large number of articles on property management topics. My first
book is entitled "Property Management for Dummies" and was published by Wiley & Sons in April
2001. This book is available at all major bookstores and most apartment associations and rental
housing industry educational sources. My columns run in many major newspapers throughout
California and nationally. The syndicated "Rental Roundtable" column written exclusively for
California appears in the San Diego Union-Tribune, the Los Angeles Times, and the San Francisco
Chronicle. Copies of these articles are available at no cost at my website: www.retodayradio.com.
The "Rental Forum" column is written for a national audience (including some smaller newspapers in
California) and is syndicated by Inman News Features. Copies of these columns are available at the
Inman website: www.inman.com.

Michael K. Livingston, Esquire
Davis, Levin, Livingston & Grande
May 23, 2005
Page 12

The compensation to be paid for the study and testimony:

My hourly rate for all time spent on this matter is $250 per hour with a rate of $295 per hour for time spent providing sworn testimony in deposition, arbitration, or trial. I have only been paid $750 for my minimum retainer and no other billings have been generated yet in this matter.

Listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years:

See attached List of Expert Witness cases which actually go back more than four years. The research for this responsive item is for cases that are closed and do not include any files that are currently in process.

I believe that this letter contains the required elements for disclosure at this time. Feel free to call if you need any additional information or have any questions.

Sincerely,

Robert Griswold