IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LISA ROMERO, | ) |
|     Plaintiff, | ) Case No. |
| | ) CV04-00285 DAE |
| vs. | ) KSC |
| | ) |
| JEFFREY LOWE, et al., | ) Volume I |
|     Defendants. | ) |

DEPOSITION OF

ROBERT GRISWOLD

LOS ANGELES, CALIFORNIA

Friday, January 27, 2006

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

REPORTED BY: SUSAN B. SAUTMAN, CSR NO. 4770

FILE NO.: A000855



EXHIBIT D

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

LISA ROMERO,                          )
            Plaintiff,                ) Case No.
                                      ) CV04-00285 DAE
    vs.                               ) KSC
                                      )
JEFFREY LOWE, et al.,                 )
            Defendants.               )
_____)

VOLUME I

Deposition of ROBERT GRISWOLD, taken on behalf of Defendants, at 9801 Airport Boulevard, Los Angeles, California, commencing at 1:50 p.m., Friday, January 27, 2006, before Susan B. Sautman, CSR No. 4770.

1  briefly take a look at it.
2       A.  Okay.
3       Q.  Does it appear to be a true and accurate copy
4  of your listing of cases that you provided in connection
5  with this case?
6       A.  Yes, sir.
7       Q.  Can you tell me if there is any case on
8  there -- and I realize it contains cases in which you
9  provided testimony, trial testimony, deposition
10 testimony and also cases that you might have been
11 retained and maybe not have testified.
12          Can you tell me if there is any cases on there
13 that arose out of the State of Hawaii?
14      A.  I don't believe any of them have.
15      Q.  So would it be fair to say this case is your
16 first case in which you were retained as an expert in
17 the State of Hawaii?
18      A.  That is correct.
19      Q.  And I take it given your prior experience with
20 depositions you understand the basic ground rules and
21 you understand that you're under oath and that your
22 testimony is being taken down in a transcript, so we can
23 dispense with those formalities, correct?
24      A.  Yes, sir.
25      Q.  Have you ever been licensed to practice law in

1  any jurisdiction?

2      A.  No.

3      Q.  Have you been a judge in any court in any
4  jurisdiction?

5      A.  No, I have not.

6      Q.  Please describe in your terms for me what your
7  field of expertise is.

8      A.  Well, generally real estate; specifically real
9  estate management as it pertains to this case, but I
10 have expertise in a wide variety of real estate matters
11 and testify accordingly in those.

12         The only area of real estate that I routinely
13 do not accept assignments would be areas where an MAI
14 appraiser or equivalent designation is required.

15         Those are generally dimunition of value-type
16 cases from a purchase or sales point view.  I do
17 valuations of rents and things like that and then
18 transactional as well as really any other area of real
19 estate.

20     Q.  Would that also include real estate broker and
21 agent-type issues?

22     A.  Absolutely.

23     Q.  Have you ever been licensed as a real estate
24 agent in the State of Hawaii?

25     A.  No.

1    Q.  Have you ever been licensed as a real estate
2 broker in the State of Hawaii?
3    A.  No, sir.
4    Q.  Have you ever taught any class in real estate
5 in the State of Hawaii?
6    A.  Yes.
7    Q.  Could you describe that for me.
8    A.  I taught a course in Honolulu for the Institute
9 of Real Estate Management.
10   Q.  How long was that course?
11   A.  One week.
12   Q.  What is the "Honolulu Institute of Real Estate
13 Management"?
14   A.  It's actually -- the Institute of Real Estate
15 Management is based out of Chicago.  It's under the
16 overall organizational structure of the National
17 Association of Realtors.  It's its own separate entity
18 and they put on courses nationally, and I have taught
19 the courses everywhere from what used to be the World
20 Trade Center in New York City to Hawaii and several
21 other states.
22   Q.  How many times did you teach this course in the
23 State of Hawaii?
24   A.  Hawaii, once.
25   Q.  When was that?

1  Q.  What other context can they occur?

2  A.  Essentially I think in Nevada, which is driven based on if you act as property manager even for entities where they may be owner managed on a commercial basis; in other words, you participate in property management activities maybe for an outside fee but maybe also for related entities of which you own part of but they're incorporated.

    And what I am trying to distinguish there is if you own a house as Robert Griswold and manage it directly, you probably don't, but if I set it up as any kind of a corporate entity and not handle it individually, XYZ Incorporated owns the house, then they may require property management certification.

15  Q.  Do you know of any jurisdiction in the country in which a property management certification is required for someone who wishes to rent out their own property?

18  A.  As my example, Robert Griswold renting out his own house to someone else, no, I'm not.  That doesn't mean that if I'm licensed, though, that I can fall beneath the standards of that appropriate license.

    So that would be another factor so for myself the fact that I have the education, experience, training, and licensing, I can't forget about that.

25  Q.  So would it be fair to say there is nothing

Page 30

1    inherent in a landlord-tenant relationship for a single
2    residential property that would require a certified
3    property manager?
4         A.  Well, again the certified property manager, as
5    I interpret it, is a specific designation that one must
6    achieve through education, training and experience.
7              So do you need to be a certified property
8    manager in order to manage your own rental house, no.
9         Q.  Prior to this case, in your experience have you
10   ever encountered another case which involved a fire
11   pole/hole?
12        A.  No.
13        Q.  This will be your first?
14        A.  That is correct.
15             MR. LIVINGSTON:  New subspecialty area.
16             THE WITNESS:  That's right.
17   BY MR. FUJIMOTO:
18        Q.  To your knowledge, are there any property
19   management standards for purposes of licensing and or
20   certification as they relate to fire pole/holes
21   specifically?
22        A.  No.  And in the coursework, preparation work
23   for licensing, continuing education and so forth I have
24   never seen any specific reference to a fire pole and
25   corresponding hole through whatever that goes with it.

1   Q.  I would like to turn back to deposition
2   Exhibit 3 which is a copy of your report generated in
3   connection with this case.
4       I will ask you some questions regarding it.
5   A.  Sure.
6   Q.  A few more general questions before that.
7       Have you ever been licensed as a real estate
8   broker in the State of Hawaii?
9   A.  No.
10  Q.  Have you ever been licensed as a real estate
11  agent in the State of Hawaii?
12  A.  No.
13  Q.  Do you own any property in Hawaii?
14  A.  No, I do not.
15  Q.  Have you ever had a situation in which you were
16  a landlord in the State of Hawaii?
17  A.  No.
18  Q.  Do you own any licenses in any capacity in the
19  State of Hawaii?
20  A.  No.
21  Q.  Aside from the national Institute of Real
22  Estate Management class that you testified to earlier,
23  have you taught any classes in the State of Hawaii?
24  A.  No.
25  Q.  Have you ever taken --

1   looking at any other deposition transcripts other than
2   what we have covered so far?
3       A.  No.
4       Q.  Was it of interest to you to review the
5   deposition of Matthew Ray Severson and/or the statements
6   of Matthew Ray Severson as the tenant occupying the
7   second floor from which Lisa Romero fell?
8       A.  Well, not knowing exactly what is in those
9   documents I can't say for sure, but I did not review
10  them.  I did not feel that I needed those specifically
11  based on what I did review.
12          I felt that I had the proper support and bases
13  for the report that's Exhibit 3 to my deposition without
14  those documents.
15      Q.  Would the same answer hold true for any
16  statements and/or deposition transcripts of tenants
17  other than Mindy Hebert and/or Matthew Ray Severson?
18      A.  Yes, sir.
19      Q.  Did you conduct any sort of site investigation
20  or site inspection in connection with your work?
21      A.  No.  Unfortunately I did not get to go to
22  Hawaii to see the subject property.
23      Q.  We would have loved to have you.
24      A.  Thank you.
25      Q.  Just for purposes of clarification, you do not

1  complete.  Have you ever been retained as a property
2  manager in a professional capacity for Hawaii
3  properties?
4      A.  No.
5      Q.  I think your earlier testimony was referring to
6  Hawaii Revised Statutes, and I believe you are referring
7  to chapter 521 which I see referenced in your report.
8      A.  That's correct.
9      Q.  And the title of that chapter is the Hawaii
10 Residential Landlord-Tenant Code.
11     A.  I have not memorized it.  That sounds familiar.
12 I don't think you're trying to trick me.  I will be glad
13 to pull it out to have the specific title of it.
14     Q.  To your knowledge, is there any Hawaii statute
15 in the Hawaii Revised Statutes that is specific to
16 property management?
17     A.  Well, as I would define it quite a few of them
18 are.  They set standards for rent, nonpayment of rent,
19 security deposits, return of security deposits, proper
20 notices to tenants, so I think that whole chapter is
21 replete with items that one would need to know, whether
22 they are a property manager for a third party or whether
23 they're acting as their own landlord/property manager.
24     Q.  In chapter 21 of the Hawaii Revised Statutes,
25 did you see any definition and/or statutory provision

1  specifically dealing with property managers and/or real
2  estate managers as opposed to landlords?
3         MR. LIVINGSTON: You mean using the terms
4  "property management"?
5         MR. FUJIMOTO: Yes.
6  BY THE WITNESS:
7     A. No, I did not. You are talking about like a
8  property management certificate or specific training
9  required like there is in the Nevada Revised Statutes,
10 and the answer is no, and that goes to my general
11 understanding that it is not a separate certification
12 required in Hawaii, so it would be more similar to,
13 let's say, California, Arizona to pick some western
14 states as opposed to Nevada, which I think is unique.
15 BY MR. FUJIMOTO:
16    Q. Does California have a statute that regulates
17 property management in the professional sense?
18    A. No. Obviously trust funds and other types of
19 things that could be applicable to property managers,
20 but they're no different than all other real estate
21 licensees.
22    Q. So it's something that is found in the
23 California Professional Code as it relates to real
24 estate persons?
25    A. Correct. Business and Professions Code.

Page 63

1  Q. That code only purports to regulate people
2  doing business as real estate professionals in the State
3  of California, correct?
4  A. You're right.
5  Q. And it does not purport to regulate people who
6  might have been practicing at one point in time as a
7  real estate agent and/or broker in California but who no
8  longer do so?
9  A. I'm not sure I understand the question.
10 Q. I guess basically the scope of the California
11 Professional Code is to deal with California
12 transactions; is that correct?
13 A. Correct. However, there is some language -- I
14 don't recall specifically the section -- but it refers
15 to transactions with parties in other states, referral
16 fees, commissions that could be paid. There is some
17 reference to reciprocity, things like that.
18 Q. For those situations, would those references be
19 limited to the transactions involving property located
20 in the State of California?
21 A. That's true.
22 Q. For example, the California Professional Code
23 would not purport to regulate a transaction in the State
24 of Hawaii, would it?
25 A. It does not, you're right.

1   Q.  Have you in your investigation seen anything in
2   any Hawaii statute regulating real estate professionals;
3   what I mean by that is agents and/or brokers that
4   purport to regulate or create a standard for property
5   managers?
6   A.  No.  Not other than again indirectly that they
7   must comply with, of course, the residential
8   landlord-tenant code if they are acting in that
9   capacity.
10  Q.  And to your knowledge, is there any statute
11  that specifically regulates property management in the
12  State of Hawaii in the professional sense?
13  A.  I didn't see any in my review of this material.
14  Q.  As you sit here today, you are unaware of any
15  such requirement?
16  A.  Correct.  Again, much of this in my review to
17  come up with my Exhibit 3 was not relevant since neither
18  of the Lowes are licensed real estate professionals in
19  the State of Hawaii, so I didn't believe it would be
20  relevant or applicable to them even if there were
21  certain standards.
22  Q.  Because it would be unfair to hold them to that
23  sort of professional standard of care unless they in
24  fact were engaged in that profession; is that correct?
25  A.  To the specific Hawaii standards.  I believe

Page 65

1  since they are licensed or were licensed in the State of
2  California, and I know the requisite education,
3  training, testing that's required to obtain and maintain
4  that level of expertise, I would hold them to that
5  standard.
6      Q.  Is there any other statute and/or standards
7  unique to Hawaii that you consulted other than chapter
8  521 of the Hawaii Revised Statutes?
9      A.  No.  I think many of the principles in my
10 report and the facts surrounding this incident are
11 general or generic, or I will call them 50-state issues.
12      Again, I do write a nationally syndicated real
13 estate column, so I have to write specifically and cover
14 general rules of real estate management.
15     Q.  Throughout your report you actually make
16 several assumptions regarding the level of knowledge
17 that the Lowes had and you base that basically on your
18 review of their deposition testimony.
19     A.  Yes, sir.
20     Q.  Did you make any assumptions with regard to the
21 level of knowledge that Lisa Romero might have had with
22 regard to a fire pole?
23     A.  Let me go back and qualify that.  I should say
24 their deposition and the exhibits to their deposition.
25 For example, there was an inspection report; there was