

March 20, 2005

Mike Livingston
400 Davis Levin Livingston Grande Place
851 Fort Street
Honolulu, Hawaii 96813

<b>Re: Romero vs. Lowe, et al.</b>

Dear Mr. Livingston:

Thank you for asking me to provide an analysis of several of the liability issues in this interesting but tragic case. Specifically, you have requested that I use my knowledge and expertise in the areas of safety engineering, photogrametric analysis, human factors, human perception, and safety and risk management to examine the causes of Lisa Romero's fall through a fireman's pole hole in the early morning hours of January 1, 2003.

I have attached a copy of my CV that details my training and experience. Briefly, I have an M.S. in Systems Engineering - Human Factors Option and a Ph.D. in Mechanical Engineering –Human Factors Option; I am board certified in Human Factors and a licensed Tribometrist. I am a retired Full Professor of Mechanical Engineering; I spent 22 years as a Professor of Engineering where I also held a joint appointment in the Department of Psychology. In 1983 I started my own Human Factors Engineering consulting firm, Applied Cognitive Sciences; work with ACS has included theoretical research, applied industrial consulting, forensic engineering, and product development. I have been retained as an expert witness on approximately 1000 cases nation wide, including some international cases. I have also attached a copy of my sworn testimony for the past 5 years.

My investigation began with a review of case related materials provided by your office. These included: (a) photographs of the interior/exterior of the 111 Hauoli Street residence, including before and after photographs of the second floor bedroom and fireman's pole hole through which Ms. Romero fell to the first floor on early January 1, 2003; (b) photographs of the metal barrier in position around the fireman's pole hole and subsequent to its removal; (c) a copy of the Complaint; (d) a copy of the tenants lease in effect on January 1, 2003; (e) floor plans submitted to the City & County of Honolulu Planning and Permitting Department in 1996 in support of and describing proposed modifications to the 111 Hauoli Street residence; (f) certain Hawaii Revised Statues and Uniform Building Code sections applicable to issues raised in this matter; and (g) the two volumes of Ms. Romero's deposition transcript.

In addition to reviewing the file materials your office provided me, I inspected the subject property, both inside and outside, wherein I made a number of observations relevant to understanding the underlying causes of Ms. Romero's fall. In addition, I also took a number of photographs and videos, as well as a variety of measurements while at the site.

This letter is not intended to be a comprehensive analysis of Ms. Romero's accident nor is it intended to be a comprehensive list of my findings and opinions. The purpose of this letter is to briefly summarize my key observations and findings to date. I understand that formal discovery was stayed by agreement of the parties until the unsuccessful conclusion of a court-ordered mediation near the end of February, 2005, and that substantial discovery (including document discovery and depositions of the Defendants and other witnesses) will now go forward. Once these discovery materials become available, I intend to review them and include any relevant factual information in my analysis. Accordingly, the analysis and findings set forth in this letter are preliminary in nature, and are subject to elaboration and possibly revision after I have had an opportunity to review relevant materials that are not now available. In addition, I have been asked to review and comment on any analyses and findings by defense experts that fall within my areas of expertise, as outlined above.

**Known Hazard**
It is my understanding that the Lowes, licensed real estate brokers, purchased the subject house with no intention of personally living in it; rather, the Lowes bought the subject property, with the hazardous hole/fireman's pole in place, with the intention of leasing the subject property.

It is indisputable that the Lowes were fully knowledgeable of the presence of the hazardous hole/fireman's pole. Furthermore, it is indisputable that the Lowes appreciated the hazardous nature of the hole/fireman's pole as evidenced by Clause 19 of the Lease Agreement, wherein the Lowes specifically warned of the unique and hazardous feature. However, within the Lease Agreement the Lowes were equivocal on permitting the use of this known hazard wherein the Lease Agreement prohibits the tenants from using the fireman's pole, unless they do so at their own risk. In essence, this is like posting a sign that says "No Trespassing", followed by, "Be Careful Upon Entering".

A landlord cannot waive his/her responsibility to provide a safe environment for tenants and their guests under any circumstances. The Lowes were sophisticated and knowledgeable owners who appreciated the potential hazards associated with the open hole and fireman's pole that was located in a high traffic area of the structure (i.e. living room and master bedroom). Furthermore, the Lowes bought the subject property with the full intent of leasing it to others who might not fully appreciate the hazards created by the hole/fireman's pole. Without question, the Lowes should have eliminated this hazard (i.e. they should have removed the pole and filled in the dangerous hole).

It is unacceptable for the Lowes to avoid the consequences of renting an inherently unsafe premise on the basis that they advised the tenants of the hazardous condition's existence. To hold otherwise would open the door to a very slippery slope that landlords

2

everywhere would seek to exploit. That is, rather than repairing known hazardous conditions landlords could merely advise of their existence and nothing more.

Leasing the subject property with the hole/fireman's pole intact, rather than correcting the inherent and known hazardous condition, left the subject dwelling in an unreasonably dangerous condition. "Informing" the tenants of the hazard, but permitting them to use it despite the known hazard cannot be considered a reasonable and meaningful warning. Worse yet, the Lowes did nothing to protect against the foreseeable risk that other guests or visitors to the house, including children, would be exposed to this unreasonably dangerous condition. Leasing the subject property in such an unreasonably dangerous condition was in blatant disregard for the safety of those who would occupy the dwelling, whether as a tenant, guest, visitor, or service provider.

The fact that there was a railing surrounding the fireman's pole and hole at the time the Lowes leased the premises to the tenants by no means eliminated the hazard. Indeed, the Residential Lease Agreement specifically noted that the fireman's pole was "possibly hazardous" despite the presence of the railing. The Lowes apparently understood, and certainly should have foreseen, that the gate in the railing might be left open, or that children would open the gate or climb over the railing, or that someone would be injured while playing on the pole, or that the tenants might remove the protective railing. The likelihood of the railing being removed is amplified by the fact that the remaining wall space is too short for a standard size dresser or desk (i.e. it is approximately 5 feet from the railing to the bathroom door). Finally, as explained in greater detail below, the fireman's pole hole constituted a violation of the building code even with the railing in place. The Lowes clearly should not have rented the property with a known hazard in violation of the building code.

**Violation of UBC**
Photographs were taken in the master bedroom prior to the railing around the subject hole for the fireman's pole being removed. These photographs clearly and unequivocally show that the top of the railing was too low to comply with the Uniform Building Code (UBC).

The UBC requires a minimum guardrail height of 42 inches for vertical elevation changes in excess of 30 inches. In this case the total vertical elevation change was over 120 inches (i.e. over 10 feet). The UBC does have a special exception for private dwellings, permitting guard rail heights as low as 36 inches, but absolutely no lower. Based on my site inspection measurements and my analysis of the photographs that were taken when the guard rail was in place, it is clear that the top of the railing was less than 36 inches; in fact, it is mostly likely less than 34 inches tall, well short of the UBC recommended guard rail height of 42 inches and absolute minimum height of 36 inches.

To illustrate, Figure 1 is a photograph of the railing when it was in place. I have overlaid on that photograph a vertical line in the corner of the room and two horizontal lines that are 36 inches above the floor; one parallel with the bottom of the window sill and the other parallel with the lanai door handle and associated wood slat in the glass door immediately behind it. These 36 inch height measurements were confirmed at the time of my inspection.

3

Notice the two horizontal lines intersect the corner line at the same point. Notice that the top of the railing where it meets the walls is well below this 36 inch line. Based on a photogrametric analysis, the top of the railing is approximately 2.5 inches below the 36 inch high horizontal line; in other words, the railing is approximately 33.5 inches. It should also be noted that the standard height for a door knob is 36 inches on-center above the floor. Anyone reasonably knowledgeable of building practices and codes (i.e. such as a real estate broker and/or leaser of buildings/homes) should have been able to tell that the subject railing violated the UBC. And where, as here, the railing was part of a "unique" architectural feature known by the Lowes to constitute a "possible hazard," it was incumbent upon the Lowes to closely inspect the architectural feature to insure it met all applicable codes.

It bears reiteration that the 36 inch minimum height requirement for railings over substantial drops is an extremely important safety provision principally intended to prevent falls. Most Group R occupancies are required to have railings at least 42 inches high. Swimming, dipping or wading pools that contain water more than 18 inches deep must be completely surrounded by a fence, wall or other enclosure, including self-closing and latching gates, at least 54 inches in height. A railing that is only 33.5 inches in height is not only a technical violation of the 36 inch guard rail height requirement within the building code, it also presents very real risks. The most obvious of these risks are the danger that children can climb over the fence, and the danger that someone might fall over the top of the railing (i.e. 33.5 inches is below the center of mass of most adults thus if they were to accidentally walk into such a low railing, they could easily flip over the top; hence the requirement for higher railing heights). The second of these risks is relevant here. Ms. Romero is 64 inches tall. If she had walked into a railing that was 33.5 inch in height in the early morning hours of January 1, 2003, the railing would have struck her just below the pivot point at her hips (i.e. below her center of mass), and she might very well have fallen over the railing and through the hole. The risk of such a scenario would be even greater for someone taller. The point is that any violation of the 36 inch minimum height requirement risked extremely serious consequences.

Without question, the subject hole/fireman's pole is unreasonably dangerous and should not have been constructed. In fact, it was not included in the original blue prints and building plans as approved by the City and County Building Department, or at any subsequent time. The hazard created by this unapproved and unauthorized construction is further exacerbated by a defective guardrail that is in direct violation of the UBC. The Lowes should not have even considered leasing the dwelling in such a dangerous condition. To do so is no different than leasing a house with a swimming pool that is too shallow for a diving board, even though one was installed, and informing the tenants that the diving board/pool are dangerous and they should not be used, but if you do, you do so at your own risk; or alternatively, warning the tenants that a 220 volt outlet has an intermittent short and not to use it, but if you do, you do so at your own risk. It is a blatant disregard for the safety of others to "pass-on" such known, inherent, and dangerous defects onto others. Such dangerous and defective conditions demand immediate remediation (i.e. removal or repair) and not a half-hearted attempt to warn only a selected subset of the foreseeable user population that will be exposed to the hazard.

4



FIGURE 1: Photograph of Subject Guardrail

Hawaii's landlord-tenant laws codify the principle that a landlord has a nondelegable duty to ensure that the premises are in compliance with provisions within the building code that materially affect safety. HRS § 521-42 includes the following provisions:

5

(a) The landlord shall at all times during the tenancy:

(1) Comply with all applicable building and housing laws materially affecting health and safety; . . .

(3) Make all repairs and arrangements necessary to put and keep the premises in a habitable condition. . . .

Subparagraph (b)(2) of § 521-42 specifically provides that the landlord's obligations under § 521-42(a)(1) are non-delegable. The tenants also were under clear statutory duties to comply with provisions within the building code that materially affect safety, as well as other duties relevant to this case (including the duty to prevent the removal of any part of the premises). See, HRS § 521-51 (1), (6), (7), and (8). Of course there is no question that the requirement in the building code that the railing be at least 36 inches in height is a building law that materially affects safety.

In short, the Lowes knew that the fireman's pole hole constituted a safety hazard even with the railing in place, and knew (or certainly should have known) that the railing was in violation of the building code safety provision requiring that it be a minimum of 36 inches in height. The rental of the property under these circumstances violated the landlord-tenant code and was irresponsible and reckless.

**Induces Hazardous Behavior**
Not only was the subject hole/fireman's pole and the associated railing unreasonably dangerous and in direct violation of the UBC, its presence induced risk taking behaviors. That is, the hole/fireman's pole served no useful or legitimate purpose. It allowed sound and light to be communicated between the living room and the master bedroom. As explained below, it constituted a hazard in the event of a fire. It was not an aesthetic attribute to the dwelling. It had no utility whatsoever. Its only "purpose" was to permit the dangerous and unsafe act of sliding down the pole to a floor that was over 10 feet lower.

It is noted that many fire departments have either removed such poles and/or prohibited their installation in new buildings because of the inherent dangers associated with their use even by those professionals trained in their use, and OSHA has characterized fireman's poles as inappropriate and "inherently dangerous."

It is also noted that the railing around the hole was equipped with a gate, held closed only by a single standard gate latch, that could readily and easily be opened with one hand, or by children; a gate that was not even equipped with a lock. Nor does it appear that the gate was spring-loaded to self close; thus, if one did not close/latch the gate behind themselves, which would be difficult to do before sliding down the pole, the gate/railing system would be open to anyone, even a small child, until someone came back upstairs and secured the gate.

The Lowes knowingly rented the dwelling to 4 young adult (i.e. over the age of 21) males in the military with an invitation to use the dangerous hole/fireman's pole "at their own risk". Not only was it foreseeable, it was extremely likely, that such tenants and their

6

friends would use the hole/fireman's pole, perhaps even under the influence of alcohol. Again, the Lowes' decision to lease the dwelling in such an unreasonably dangerous state is, in essence, no different than renting a dwelling to 4 young male naval officers with a swimming pool too shallow for its diving board and permitting the tenants to use the diving board at their own risk. Any reasonable and prudent landlord would remove the defective and dangerous diving board (here, the fireman's pole) before leasing the dwelling.

**Additional Hidden Hazards**
At the time of this preliminary letter, I have not had the opportunity to fully analyze other potential hazards created by what appears to be an "illegal" modification to a dwelling (i.e. a substantive modification/remodel without a building permit and one that violates the UBC). There are at least two areas that warrant further investigation.

One is the effect of the hole on the structural integrity of the flooring. The hole in the floor is at least 36 inches wide in both directions. As such, this would have necessitated removing at least one floor joist (i.e. typically spaced at 12 to 18 inches apart) and possibly two. Such removal can be safely accomplished only if headers and supports are properly designed and installed. Without further information and/or testing, there is no way to confirm such structural improvements were made when the hole was cut into the floor and its supporting floor joists.

In addition, the large open hole in the floor compromises the fire rating of the floor/ceiling combination. This is particularly disturbing given the open balcony just outside the main doorway leading into the master bedroom that could potentially create a circular draft. However, further investigation is necessary to determine if the cutting of the hole in the master bedroom floor/living room ceiling, violated any UBC or NFPA codes.

**Desk Assembly and Positioning**
Access to the master bedroom is provided by a spiral stairway from the main floor. The large desk that was installed in the master bedroom, which resulted in the removal of the railing around the hole/fireman's pole, could not be carried (i.e. in an assembled state) up the spiral stairway. Nor is it likely the desk was assembled and "hoisted" over 13 feet in the air (i.e. over the 3 foot high wall affronting the upstairs hallway balcony). The only reasonable manner to install the desk upstairs would have been to assemble the desk on site (i.e. in the master bedroom).

Given the size and weight of the desk (i.e. approximately 6 feet long and apparently made of pressed board), it would have been very difficult for one person to move into place. This is particularly true since one end of the desk was positioned literally right up "against" the hole in the floor; thus, one could not simply stand on that end and pivot the desk into position. At this time I cannot say with certainty that the desk was not moved into place by a single person. But I would note that doing so would have been a difficult and challenging task for one person, and much easier and safer if it had been done by two people.

7

**Removal of Rail**
As noted by the Lowes in their lease agreement, the hole/fireman's pole is undeniably a hazardous architectural feature of the home. However, the removal of the railing while leaving the hole in the master bedroom floor open and unguarded was patently and extremely reckless and a blatant disregard for safety of any and everyone that might have reason to be in the bedroom. The subsequent filling of the hole with foam, without reinstalling the railing or some type of proper barricade was equally reckless and again a blatant disregard for safety of others as such actions help to camouflage the hole, particularly at night.

**Ms. Romero's Behavior**
Ms. Romero repeatedly testified, under oath, that she did not know that the railing had been removed prior to her fall. This testimony is consistent with normal human behavior.

Human evolution is based on us learning to perceive what is "there" (i.e. food, water, predator, and so forth); we don't readily perceive what is "not there". In fact, games and puzzles are often times specifically designed to take advantage of this obvious human limitation (i.e. what is wrong with this picture, what is missing in this picture, etc.). In addition, we live in an information rich environment; as such, our sensory systems are bombarded with far more information than we can possible perceive and cognitively process. We must selectively attend to and process only a small portion of our sensory inputs (i.e. light, sound, etc.). The primary things we attend to (i.e. expend our limited cognitive resources on) are those items that are relevant and necessary to the task we are performing at any moment in time. In addition, things which are highly salient (i.e. large, moving, brightly colored, etc.) are also likely to attract one's attention.

There is nothing about the subject railing, or the lack thereof, that was relevant to any task Ms. Romero was performing prior to her fall; nor was there anything salient about its absence. During the two times Ms. Romero was in the upstairs bedroom prior to her fall (i.e. after the railing had been removed), Ms. Romero's attention was focused on her boyfriend, and their intimacy/sexual relations. The unexpected and unknown missing railing was not at all relevant to any task she was performing, nor was there anything salient about its absence. It is reasonable, foreseeable, and likely that Ms. Romero or any other reasonable and prudent person would have failed to perceive that the subject railing had been removed under the circumstances of Ms. Romero's brief time spent in the master bedroom prior to her fall.

Even if one assumes for the sake of argument that Ms. Romero did notice prior to going to sleep that night that the railing was missing, that would not make it "safe". That is why the UBC mandates that any drop over 30 inches must be protected by a minimum 36 inch high guard rail, no matter how "obvious" the drop-off might be. In addition, even if we "know" something (i.e. it is a part of our permanent long term memory such as our own birthdate) that does not mean that we are "aware" of it at all times (i.e. actively part of our conscious awareness). Clearly, we know far, far more than we can possibly be aware of at any one instant in time. No one could reasonably expect a person to first learn about a missing railing for the first time only hours before going to sleep, and to then be consciously aware of it the moment they awake in the middle of the night.

8

Ms. Romero also testified that on the various occasions she had slept in the bedroom that she had always slept on the left side of the bed (i.e. when facing it from the foot of the bed). As such, whenever she needed to get up and go to the bathroom, she would have had to have walked parallel to the bed, and then angled slightly to her left to get to the bathroom door. On the night of her accident, Ms. Romero was sleeping on the right side of the bed. Thus, when she got up in the night to go to the bathroom, her pattern of behavior would have instinctively led her directly into the open and unguarded hole. Certainly, there is nothing "wrong" or inappropriate or inherently dangerous with Ms. Romero having walked from the bed in the general direction she was headed at the point in time when she fell through the open and unguarded hole.

I also carefully inspected and video taped the surrounding exterior perimeter of the dwelling. There are no street lights within the immediate vicinity and/or field of view of the master bedroom. Any exterior illumination would have been simply due to the ambient light pollution in Kailua. While this may have been sufficient to have been able to see well enough to generally guide one's path, it certainly would not have provided sufficient illumination to have seen the open hole, particularly since the walls upstairs and down, as well as the carpet were all lighter in color (i.e. no distinct contrast). In fact, the ambient light entering the window that Ms. Romero would have been approaching when she rose to go to the bathroom might very well have been mistaken by her as the entrance into the bathroom.

Even if some interior illumination had been provided, it would be foreseeable that someone awaking in the night would not perceive the dangerous unguarded hole in the floor. For example, when people walk they do not look down at the floor or their feet. Rather we look straight ahead, typically 25 feet or more; we use our vision for gross navigation. Since the open and unguarded hole was approximately 12 feet beyond the point where Ms. Romero would have gotten out of bed, it is very unlikely that the hole would have ever fallen within her foveal or central field of view.

In short, there is no reason to believe that Ms. Romero contributed her fall in any manner. Ms. Romero did not commit any errors of omission (i.e. failing to do something she should have such as putting on her glasses at night as the defense has asserted), nor did she commit any errors of commission (i.e. doing something she should not have done). Nor is there any evidence to suggest that drugs or alcohol were contributing factors in Ms. Romero's accident and fall. Based on all the evidence I have reviewed it is my opinion that Ms. Romero's actions and behaviors, or lack thereof, were not a contributing factor in her accident.

As indicated at the outset, this report is preliminary, and subject to elaboration or possibly revision based on additional relevant materials that I understand will become available during the course of this litigation. I also look forward to reviewing and responding to the analyses of experts in my areas of expertise who have contrary or additional observations and opinions.

Please let me know if you have any questions or if I can be of any further assistance. I look forward to continuing to work with you on this matter.

Sincerely,

Richard Gill, Ph.D., CHFP, CXLT
Chief Scientist