Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LISA ROMERO, | ) |
|     Plaintiff, | ) Case No. |
| | ) CV04-00285 DAE |
| vs. | ) KSC |
| | ) |
| JEFFREY LOWE, et al., | ) Volume I |
|     Defendants. | ) |
| _____ | ) |
| And Related Cross-Action. | ) |
| _____ | ) |

DEPOSITION OF

RICHARD GILL, Ph.D.

LOS ANGELES, CALIFORNIA

Friday, January 27, 2006

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

REPORTED BY:  SUSAN B. SAUTMAN, CSR NO. 4770

FILE NO.: A000855


EXHIBIT E

ac9c59b0-83d0-4314-8a7f-d7247b2c99c0

1  Q.  And I take it you have never been licensed to
2  practice law?
3  A.  That's correct.
4  Q.  Have you ever been appointed as a judge for any
5  court in any jurisdiction?
6  A.  No, sir.
7  Q.  As we sit here today, you are not qualified to
8  render legal opinions; is that correct?
9  A.  That's correct.
10  Q.  And you don't intend to offer any legal
11  opinions?
12  A.  No, sir.
13  Q.  What in your background, if anything, pertained
14  to areas of real property rentals or real property
15  leasing?
16  A.  The only experience or expertise that I would
17  have in terms of that would be from a safety perspective
18  of knowing what the safety issues are, knowing how
19  property managements and property leasing agencies and
20  so forth have risk management and safety programs.
21  My experience over the years in cases such as
22  this and the Violich case.  So work in cases such as
23  that over the years.  I'm familiar with the basic laws
24  in terms of landlord-tenants.  Again, I'm not here to
25  offer legal opinions.

1    Q.  Have you taken any classes in landlord-tenant
2  law in the State of Hawaii?
3    A.  No, sir.
4    Q.  Do you consider yourself as an expert in the
5  area of landlord-tenant law in the State of Hawaii?
6    A.  No, sir.  I have familiarity above that of the
7  normal layperson and in particular as it pertains to
8  safety-related issues, but I am not an expert in law.
9    Q.  Okay.  Thank you.  What, if anything, in your
10 background pertains to fire poles and/or fire pole
11 holes?
12   A.  Well, I know there has been some studies over
13 the years of orthopedic-type injuries that firemen have
14 received utilizing the poles.  It seems to me OSHA has
15 come up with a position paper on that where fire poles
16 in a literal professional setting are discouraged.
17      I don't know that they're even permitted in new
18 buildings anymore.  General safety issues in terms of
19 knowing what fall heights are and what fall heights have
20 to be guarded and why the existence of a fire pole
21 creates hazards and what those hazards are.
22   Q.  You mentioned that there were studies regarding
23 orthopedic injuries of firemen as a result of fire pole
24 holes.
25   A.  Right.

1  Q. Can you cite me to any one of those studies.
2  A. No. I didn't do a literature review to try to
3  identify those for the purposes of this case. I just
4  know over the years that's one of the things I have
5  either seen presented at a conference or have read in
6  the Human Factors Journal.
7  Q. And you brought a copy of your file with you
8  here today, correct?
9  A. I brought my entire file, yes, sir.
10 Q. Did you have a copy of any article or study of
11 that sort in your file?
12 A. No, sir. Again, I did not do a literature
13 review for the purposes of this case.
14 Q. Okay. You also mentioned that you saw
15 something from OSHA that may have created a restriction
16 as to fire poles and/or fireman's holes in new
17 buildings.
18 A. Right.
19 Q. Can you cite me to what you are referring to.
20 A. No. It's just an understanding that I have. I
21 don't know if it's something I specifically read or
22 again if it was a conference that I attended or it was
23 through discussions I had with people, but I don't have
24 a literal document on that that I tried to search out.
25 Q. What does "OSHA" stand for?

Page 26

1    A.   Occupational Safety and Health Administration.

2    Q.   What does, in your understanding, the

3 Occupational Safety and Health Administration deal with?

4    A.   It's an employer-employee relationship so it's

5 safety in the workplace.

6    Q.   Does it have application or does OSHA have any

7 application outside of workplace issues?

8    A.   It does not have any legal application.  The

9 notion is that OSHA is another one of these measures of

10 standards of care of what are known hazards and what

11 kinds of things are considered safe or unsafe, and if

12 you look at the progression of safety it starts with

13 theoretical research where people identify potential

14 problems, and then it gets published with potential

15 solutions and then you get recommended design

16 guidelines, and then it gets formalized as a standard

17 and ultimately you will see it adopted as a statute by

18 OSHA, the notion being if it finally gets to OSHA it's

19 been around for a long time.

20   Q.   But in terms of standards of care created by

21 OSHA, those only have applications in the workplace

22 setting; is that correct?

23   A.   They only have legal application.  I guess I

24 wasn't clear on that.  What I'm trying to say is that if

25 you see something in OSHA as this is something that's

1  not permitted or this is something that is required,
2  then you can rest assured that that is a safety
3  principle that has been well researched and well studied
4  and been around for decades. In other words it's a
5  common reference point to go to.
6       If it's in OSHA you know it has been around for
7  a long time. If it's not in OSHA it doesn't really tell
8  you much one way or another.
9       Q. But your earlier testimony is that OSHA itself
10 does not have any legal application outside of workplace
11 settings?
12      A. That's correct. So for example, if you had a
13 carpet cleaner come to your home that carpet cleaner
14 cleaning carpets in your home would be covered under the
15 OSHA requirements.
16      Q. Would the owner in that circumstance also be
17 regulated by OSHA?
18      A. No, sir. Just the employer.
19      Q. As we sit here today you can't cite me to
20 anything specific in OSHA requirements, regulations or
21 otherwise that pertain to fireman's poles or holes; is
22 that correct?
23      A. No. I would just have to refer you to the OSHA
24 website. You would look under the 1910 section and you
25 would be able to find things pertaining to that. That's

1   the general workplace safety.  1926 is for construction,
2   which I don't think you would find anything there.
3       Q.  Is there anything else in your background
4   relating to fireman's poles and or fireman's holes other
5   than what you have described so far?
6       A.  Not that I can think of, no, sir.
7       Q.  The remainder of deposition Exhibit 1 after
8   your CV is a listing of your sworn testimony for the
9   past five years; is that correct?
10      A.  Yes, sir.
11      Q.  But how much in terms of percentages of this
12  testimony was for on behalf of a plaintiff as opposed to
13  a defendant?
14      A.  I can't answer that directly.  Let me answer it
15  in another way, and that is generally speaking over the
16  last five years the work that I have been retained on is
17  about 70 percent plaintiff, about 30 percent defense.
18  What filters up to sworn testimony, I'm not sure.
19      Q.  So over the past five years 70 percent of the
20  time you're retained as an expert witness on behalf of
21  the plaintiff and the other 30 percent was on behalf of
22  the defendant?
23      A.  On civil matters, that's correct.
24  Criminal-type matters it's 50-50.
25      Q.  Because in criminal matters the plaintiff is

1  knowledge has Aston on your behalf rented the property
2  out to any tenants?
3      A.  Well, it's not rented.  It's a motel room or
4  hotel room, so you pay a fee to stay in it per night.  I
5  don't know if I would call that renting it.  I don't
6  know what the term would be for it.
7      Q.  Your understanding was that you own the room
8  but that Aston manages it as a hotel room; is that
9  correct?
10     A.  That's correct.  It was in the hotel pool when
11 I bought it.  I simply signed a paper that said yes, it
12 can stay in the hotel pool.
13     Q.  So as you sit here today it would only be for
14 short-term periods as opposed to any long-term rentals?
15     A.  It's a typical hotel; you stay in one night,
16 two nights.  It's a business hotel, not a resort hotel.
17     Q.  And your arrangement with Aston does not
18 contemplate long-term leases?
19     A.  Not at all.  In fact, it would not be
20 acceptable to me because I need to have it to stay in.
21     Q.  Have you yourself ever worked as a property
22 manager for any landlord in any state?
23     A.  No, sir.
24     Q.  Have you yourself worked as a property manager
25 for any landlord in the State of Hawaii?

1    A.   No, sir.
2    Q.   Now is a good time to take a break.
3         (Brief recess.)
4  BY MR. FUJIMOTO:
5    Q.   Professor Gill, have you ever taught any class
6  in property management?
7    A.   No, sir, I haven't.
8    Q.   In the area of human factors is there an area
9  called photogrametry or photogrametrics?
10   A.   People in human factors sometimes use that, but
11 I don't know it's a subfield within human factors.
12   Q.   Can you describe what that means.
13   A.   Photogrametry or photogrametrics is being able
14 to take photographs and pull off quantitative
15 information about in particular sizes of objects,
16 location of objects, one relative to another, placement
17 of objects within the visual field.
18        So it allows you to project depth or compute
19 depth, I guess I should say.
20   Q.   Would it be fair to say that photogrametrics is
21 always less accurate than actual physical measurements
22 of objects themselves?
23   A.   If the physical object is still in place and
24 available then that would be the preferred way to do it.
25   Q.   Because in photographs things can get