```
 1            UNITED STATES DISTRICT COURT
 2          IN AND FOR THE STATE OF HAWAII
 3                      - - -
 4
 5   LISA ROMERO,
 6
 7        Plaintiff,
 8   vs.              No. CV04-00285-DAE KSC
 9
10   JEFFREY LOWE, LINDA LOWE,
11   MATTHEW RAY SEVERSON, et al.
12
13        Defendants.           CERTIFIED COPY
14
15
16                DEPOSITION OF
17              KULVEEN SACHDEVA, M.D.
18               San Ramon, California
19                January 11, 2006
20
21   FILE NO. A000098
22   ATKINSON-BAKER, INC.
     COURT REPORTERS
23   500 North Brand Boulevard
     Third Floor
24   Glendale, California  91203
     (818) 551-7300
25   REPORTED BY:  SUSAN N. WILLIAMS, CSR NO. 4784
```

EXHIBIT B

1

```
 1              UNITED STATES DISTRICT COURT
              IN AND FOR THE STATE OF HAWAII
 2

    LISA ROMERO,
 3

 4              Plaintiff,

    vs.                      No. CV04-00285-DAE KSC
 5

    JEFFREY LOWE, LINDA LOWE,
 6  MATTHEW RAY SEVERSON, et al.

 7              Defendants.

 8
 9          Deposition of Kulveen Sachdeva, M.D.,
10  taken on behalf of Defendant, at 5401 Norris
11  Canyon Road, Suite 110, San Ramon, California
12  commencing at 10:00 a.m., Wednesday, January
13  11, 2006, before Susan N. Williams, CSR No.
14  4784.
15
```

2

```
 1              A P P E A R A N C E S
 2
 3   FOR PLAINTIFF:
 4   DAVIS, LEVIN, LIVINGSTON & GRANDE
     BY: JEFFREY J. CARTER, ESQ.
 5   851 Fort Street
     400 Davis, Levin, Livingston & Grande Place
 6   Honolulu, Hawaii  96813-4317
 7   FOR DEFENDANT:
 8   MATSUI, CHUNG, SUMIDA & TSUCHIYAMA
     BY:  WARD F.N. FUJIMOTO, ESQ.
 9   Mauka Tower
     737 Bishop Street
10   Suite 1400
     Honolulu, Hawaii  96813
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1      Q.   Where did you do your internship?
 2      A.   I did one internship in India and I did one
 3 internship in Philadelphia at Frankford Hospital and
 4 then I started my neurology residency in New York in
 5 19 -- June 1985.
 6      Q.   Are you licensed to practice medicine in the
 7 State of Hawaii?
 8      A.   No, I am not.
 9      Q.   Are you licensed to practice anywhere else?
10      A.   In the State of California.
11      Q.   Any other states?
12      A.   No.
13      Q.   Are you board certified in any field?
14      A.   I am board certified in neurology.
15      Q.   Any other board certifications?
16      A.   No.
17      Q.   Have you ever been board certified in the
18 area of neurosurgery?
19      A.   No.
20      Q.   At the present time are you qualified to
21 perform surgery?
22      A.   No.
23      Q.   Going back to the prior times that you were
24 testifying as an expert witness, who was the
25 plaintiff's counsel in the Hawaii case, if you can
```

```
 1    A.    I believe it was one time.
 2    Q.    When was this conversation?
 3    A.    Based on the record in the chart, it was a
 4 teleconference scheduled for 12-7-04 and I presume
 5 that it did happen on that day.  I stand corrected.
 6 I think that was changed to 12-9-04.
 7    Q.    When you say 12-9-04, that's December 9th of
 8 the year 2004?
 9    A.    Correct.
10    Q.    Was anybody else present or participating in
11 that telephone conference?
12    A.    I could not independently recall that.
13    Q.    What was discussed during that telephone
14 conference, to the best of your recollection?
15    A.    I don't have any documentation of the
16 conference.  I will go with memory, which perhaps I
17 should not, but it was essentially reviewing the case
18 for Lisa Romero and her medical condition.  It was a
19 very broad answer, but I don't remember any further
20 details.
21    Q.    What did you discuss with Mr. Carter this
22 morning?
23    A.    It was more of an introduction, that he's
24 also has met with Lisa and that Lisa has now moved
25 over to Atlanta.  I inquired about her current
```

```
 1  Dr. Sachdeva today?"
 2      A.  "L1 burst fracture follow-up care - pain
 3  management.  Referred by Davis, Levin, Livingston,
 4  Grande Law Firm in Hawaii.  Prior patient/client,
 5  Augustine Joseph."
 6      Q.  Prior to this date, had you ever had a
 7  contact with the law firm of Davis, Levin, Livingston
 8  in Hawaii?
 9      A.  I don't have an independent recollection of
10  names.  According to this document it seems that they
11  have been the attorneys for the other client.
12      Q.  Could it have been that that other patient
13  was Augustine Joseph?
14      A.  I would not rather discuss the patient under
15  HIPPA regulations unless I have to.
16      Q.  Without getting any further detail, I just
17  want to find out if that was the name of the prior
18  patient?
19      A.  Again, I'd rather not answer that question.
20      Q.  At least according to this document it seems
21  likely is saying that Augustine Joseph might been a
22  prior patient of yours?
23      A.  I'll let you make that conclusion.
24      Q.  Is that a fair conclusion?
25      A.  I am subject to HIPPA regulations.  I would
```

1  rather not comment on that.

2      Q.  At least according to this document, Lisa
3  Romero, is indicating that Augustine Joseph was a
4  client of Davis, Levin, Livingston & Grande Law Firm,
5  correct?

6      A.  That is what the document indicates.

7      Q.  Can you read the next section, please?

8      A.  "Please list your neurological problems in
9  order of importance to you."  And her answer was
10 "Chronic back pain, follow-up care for L1 burst
11 fracture and surgery."

12         The next column is "Please list all
13 medications, including nonprescription drugs and
14 over-the-counter medications." And her answer is
15 "Celebrex, 200 milligrams as needed, Vicodin, 500
16 milligrams as needed, Tylenol, Advil, Aleve as needed,
17 max per day."

18         Then she is, "San Q 17, 9 tabs per day" and it
19 goes on to asking about "Have you ever been diagnosed
20 with high blood pressure, diabetes, stroke, high
21 cholesterol, migraines."  She marks "No" to all of
22 them.

23         "Are you allergic to any medications?"  She
24 said "Yes, penicillin."  "Have you ever smoked?"  She
25 says "No."  Her family history is reviewed.  Stroke

1   A.   I don't know.
2   Q.   From time to time in working in your
3   practice, do you come into contact with other experts
4   that may be involved in litigation or retained on
5   behalf of the plaintiff?
6   A.   Are you saying have I reviewed any other
7   records from experts in the past on other cases?
8   Q.   Right now do you ever come in contact or have
9   any interaction with any experts that have been
10  retained by the plaintiff?
11  A.   Over other cases.
12  Q.   Yes, in general?
13  A.   I've had the opportunity of reviewing the
14  reports.  If that is considered a contact, I have
15  reviewed reports, but I don't have -- we don't sit and
16  discuss cases in conferences, no.
17  Q.   Have you ever received questionnaires from
18  other experts to respond to in writing?
19  A.   From time to time, yes.
20  Q.   Do you recall receiving a questionnaire from
21  a vocational expert by the name of Thomas Sincowski?
22  A.   Yes, I do.
23  Q.   Do you recall receiving one in connection
24  with this case?
25  A.   Yes, I do.

```
 1      Q.   Do you also recall receiving a questionnaire
 2  from a practical nurse by the name of Glenda Evenshaw?
 3      A.   I remember talking to her.  I don't remember
 4  a questionnaire, per se, but it's in my file, so I'm
 5  sure it ...
 6           MR. FUJIMOTO:  Can you mark this next in
 7  order?
 8           (Document marked Defendant's Exhibit 7.)
 9  BY MR. FUJIMOTO:
10      Q.   I'd like to show you what has been marked as
11  deposition Exhibit No. 7, Doctor, and ask you to take
12  a look at that, which appears to be a Line of
13  Questioning for Medical Expert, and tell me if that is
14  a true and accurate copy of a question and answer
15  sheet in your file?
16      A.   Yes, it is.
17      Q.   For the record, that is page 26 of your
18  subpoenaed records.  At the top is says "Center for
19  Career Evaluation."
20           Does this refresh your recollection as to
21  whether or not you might have received this
22  questionnaire from Thomas Sincowski?
23      A.   Yes, it does.
24      Q.   According to this, you received this
25  questionnaire on September 24, 2004; is that correct?
```

```
 1    A.   That is correct.
 2    Q.   When did you complete and respond to the
 3 questionnaire, if you will?
 4    A.   I do not remember.
 5    Q.   Do you have any indication in your file in
 6 terms of either a faxed cover sheet or a transmittal
 7 that would indicate when you returned the
 8 questionnaire to Mr. Sincowski?
 9    A.   I don't.
10    Q.   What would be your best recollection of when
11 you would do so based on your general practice?
12    A.   Within a week or two.
13    Q.   Did you have an understanding when you
14 received this questionnaire as to why Mr. Sincowski
15 was giving you the questionnaire?
16    A.   Please do remind me.  Is he the vocational
17 counselor?
18    Q.   Yes.
19    A.   Right.  So in reference to her work ability
20 and vocational rehabilitation, it was in reference to
21 that.
22    Q.   Did you have any prior discussions with
23 anyone indicating that Mr. Sincowski might be
24 contacting you?
25    A.   I'm sure I would not talk to anybody unless I
```

1  had prior notification or authorization to do so, so
2  -- but the office would have taken care of that.
3      Q.  Do you recall receiving any communication
4  with Lisa Romero herself asking you that you answer
5  questions from Thomas Sincowski?
6      A.  I don't have an independent recollection of
7  that.
8      Q.  Is it possible that that might have occurred?
9      A.  Yes, it is possible.
10     Q.  Did you have an understanding of why Mr.
11 Sincowski was giving you questions?
12     A.  To evaluate her for her functional capacity.
13     Q.  What is an evaluational functional capacity?
14     A.  It's a science where we try to identify what
15 the patient's ability are going to be on a day-to-day
16 basis and trying to plan for their future, in the
17 workforce or their life in general.
18     Q.  In your practice, have you referred out
19 patients for functional evaluation capacities?
20     A.  I often do refer patient for functional
21 evaluation capacities.
22     Q.  In this case did you refer Lisa Romero out
23 for functional capacity evaluation?
24     A.  No, I did not.
25     Q.  In other words, Mr. Sincowski came to you

```
 1  first?
 2      A.  Yes.
 3      Q.  Can you go ahead -- and I know it's going to
 4  be tedious -- and read the questions and your
 5  handwritten answers -- strike that.
 6          Is that your handwriting there?
 7      A.  Yes, it is.
 8      Q.  Can you go ahead and read the questions and
 9  answers as they appear on this page?
10      A.  "What is the diagnosis?" The answer is "L1
11  burst fracture, chronic pain, neuropathic pain, status
12  post laminectomy, T12 to L1 with instrumentation."
13  Second is "Do you recommend any future treatment?
14  (Specify.)"  I've written "Medications, exercise
15  program, independent or gym/therapist."
16          "Is medical condition permanent and
17  stationery?" The answer was "Yes." "Are there any
18  residual functional limitations from prior injuries?"
19  The answer was "None, no prior injury."  "What are the
20  residual functional limitations from this injury?"
21  "Low endurance for sitting long hours, lifting,
22  limitations with bending, twisting, pushing."  "Is
23  there a need to have regular breaks for certain
24  activities?  How long?  How often?"  The answer is
25  "Sitting three to four hours for few to several
```

1  minutes." I suppose those are the breaks.
2      Next question, "Are there limitations in
3  performing any activities of daily living?" The answer
4  is "No/household chores, limitations." "Are there any
5  limitations in terms of driving?" The answer is "Yes,
6  one hour maximum." "Is the patient able to work full
7  time? If not, why? When?" The answer is "Yes, with
8  limitations."
9      Then the next is, "Is the patient able to work
10 part time? How many days per week and hours per
11 week?" The answer is "Yes, with limitations." "Are
12 there any restrictions in terms of typing, computer
13 input, desk calculator input or writing activities?"
14 The answer is "No." "Are there any restrictions in
15 terms of filing activities or answering the phone?"
16 The answer is "No." "Would the patient benefit from
17 ergonomic equipment? Are there any specifically
18 designed with work stations or alternative work
19 schedule that would maximize potential for full-time
20 employment? What modifications?" The answer is "Yes,
21 ergonomic chair, ergonomic desk."
22      Next is, "What activities does the patient
23 report he/she cannot do physically on the job? Do you
24 agree?" The answer is "Lifting 20 pounds, bending,
25 pushing, pulling." Slash for no ladder, crawling.

1  "Is any type of work hardening, physical therapy or
2  pain management program recommended?" The answer is
3  "Work hardening and PT." "Will bursitis or arthritis
4  interfere with any work activity in the future?" The
5  answer is "Possibly."
6      Q.  Again, as with your clinical notes and your
7  narrative reports, in responding these questions you
8  were trying to be as candid and complete as possible?
9      A.  Yes.
10     Q.  With the exception of the last question and
11 answer on the bottom of the page, but all of the prior
12 questions and answers, you were trying to be --
13 stating opinions within a reasonable degree of medical
14 probability?
15     A.  That's correct.
16     Q.  And obviously the last sentence talks about
17 possibilities which by definition would not be a
18 reasonable degree of medical probability; is that
19 correct?
20     A.  That's correct.
21     Q.  Initials on the bottom of the page, are those
22 your initials?
23     A.  Yes, it is.
24     Q.  Did you receive any prior contact from Tom
25 Sincowski prior to receiving this questionnaire?

1   A.   I do not remember.
2   Q.   So as far as you know, the first time you
3   were contacted by Tom Sincowski was on September 24th,
4   2004?
5   A.   That may not be correct, but I cannot
6   remember otherwise.
7   Q.   As you sit here today, you don't have any
8   recollection of any prior communication, correct?
9   A.   I don't have any recollection, but the office
10  may have had some communication.
11  Q.   In terms of your office practices, if the
12  office received a communication, would it have been
13  their practice to note it in the file and/or the
14  patient's chart?
15  A.   It depends upon the notification.  If it's
16  somebody informing us that they are going to fax
17  paperwork, no.  If it is actual note to be made to
18  notify the doctor, it will be in the patient's chart.
19  Q.   I think earlier in your testimony you
20  referred to a conference call that you might have had
21  on or about December 7th, 2004.  Do you recall that?
22  A.   With?
23  Q.   I believe at that time with the plaintiff's
24  attorneys.
25  A.   Yes, I remember having a conference call.

```
 1      Q.   Do you remember Mr. Sincowski also being
 2   present in that conference call?
 3      A.   I believe there were more than one person and
 4   if I remember correctly, he was present in that
 5   conference call.
 6      Q.   As you sit here today, can you recall any
 7   other telephone conversations with Mr. Sincowski other
 8   than that conference call on December 7th, 2004?
 9      A.   I don't recall independently.
10      Q.   In the "Diagnosis" section, what do you mean
11   by "Neuropathic pain"?
12      A.   When the quality of the pain is persistent
13   like she has in her spine, with nerves all around it,
14   we generally will use the term "neuropathic" because
15   the source of the pain may partly be related to the
16   nerve.
17      Q.   Is that intended to give any quantitative or
18   qualitative indication as to the severity of the pain?
19      A.   No.
20      Q.   So in and of itself the phrase "Neuropathic
21   pain" doesn't mean anything with respect to the pain
22   level.  Is that a fair statement?
23      A.   Yes.
24           MR. FUJIMOTO:  We'll go ahead and mark this
25   next in order.
```

1  will require additional surgery in the future?
2      A.   I would say the probability is high, yes.
3      Q.   And upon what do you base that opinion?
4      A.   Based on medical knowledge, how the spine
5  works, knowledge of the neurological system.
6      Q.   During the course of your work with Lisa
7  Romero, did you perform any independent diagnostic
8  tests in terms of MRIs or x-rays with regard to the
9  hardware?
10     A.   No.
11     Q.   So, therefore, your opinions were limited to
12 what you reviewed in terms of the prior films,
13 correct?
14     A.   My contact with Lisa was over a period of one
15 year.  We're talking the rest of her life.  Her
16 symptoms were stable over the course of the year that
17 I saw her, so no further MRIs were indicated, but as
18 time goes by, that may not be holding true.
19     Q.   Would it be fair to say, Doctor, you really
20 don't know that at this point in time and again, it
21 will take the passage of time to determine whether or
22 not within a reasonable degree of medical probability
23 Lisa Romero will, in fact, require future surgery?
24     A.   You are right, but statistically, being that
25 she is 34 and has her whole life ahead of her,

```
 1  statistically the odds are against her.
 2      Q.   But we really do not know at this point in
 3  time, correct?
 4      A.   That's fair.
 5           MR. FUJIMOTO:  Thank you.  I don't have
 6  anything further.
 7                       EXAMINATION
 8  BY MR. CARTER:
 9  Q.  Doctor, a couple very brief questions.  One, in
10  your opinion, were the medical services that you
11  provided to Lisa Romero reasonable?
12      A.   Yes.
13      Q.   And were the charges for the services that
14  you provided to Lisa Romero reasonable as well?
15      A.   Yes.
16      Q.   And to the best of your knowledge, have those
17  charges been paid?
18      A.   I am not aware of any problems.
19      Q.   You are not aware of any problems.  To the
20  best of your knowledge, her bills have been paid?
21      A.   Yes.
22      Q.   When you prepared these medical reports that
23  have been referred to in the examination by Mr.
24  Fujimoto, these reports were prepared shortly after
25  the patient's visit; is that correct?
```