RECEIVED JAN 0 6 2005

January 5, 2005

Michael Livingston
Attorney at Law
**LAW OFFICES OF DAVIS, LEVIN, LIVINGSTON & GRANDE**
851 Fort Street, 4th Floor
Honolulu, Hawaii  96813

RE:    **Lisa Romero**

Dear Mr. Livingston:

Enclosed is the Vocational Consultation Report regarding Ms. Lisa Romero, who participated in a Vocational Evaluation and Functional Capacity Evaluation on 6/25/04 and 8/17/04. The following records were reviewed prior to submission of this report:

**Medical**
Neurological Surgery
Straub Clinic & Hospital
Pacific Brain & Spine Medical Group
Castle Medical Center
Marianne Hafer, L.Ac., D.O.M.
University Health Services – Tang Center
Ilene Dillon, EMDR
East Bay Neurosurgical Group
Robert Fink, M.D.

**Employment**
Lisa Romero

If you have any questions regarding this report, please feel free to call for clarification.

Sincerely,

Thomas P. Yankowski, M.S., C.V.E.
VOCATIONAL CONSULTANT

TPY/rs


EXHIBIT B

0001

# VOCATIONAL CONSULTATION REPORT

## PERSONAL BACKGROUND

Ms. Lisa Romero, a 33 year-old female (DOB: 7/14/71), currently resides in Berkeley, California. She is a single woman, without a criminal record. She possesses a California driver's license. She is bilingual in Spanish and English.

In terms of her educational background, Ms. Romero reported that she was currently enrolled in the Doctoral Program at the School of Public Health at the University of California in Berkeley. She has maintained a grade point average of 3.9. Her specialty is Adolescence and Womens' Reproductive Health, and she plans to complete her schooling and dissertation in order to graduate by May 2005. Ms. Romero also obtained a Masters in Public Health from the University of New Mexico in 1999. She achieved a Bachelor of Science in Molecular Science/Chemistry from the University of New Mexico in 1994.

In terms of hobbies, she reported that she enjoys knitting, reading, and taking walks. She does perform some yoga, but she is limited in what she can perform. She is no longer able to run or perform kickboxing for exercise following her injury.

## WORK EXPERIENCE

Job Title:        Project Director
Employer:         University of California, Berkeley
Dates:            2001 to present
Wages:            $25 per hour for 20 hours a week of work for the last few summers.
Job Duties:       As a graduate student researcher, she helped manage a three-year California Wellness Grant. She primarily was involved with writing a booklet.
Job Demands:      She performed most of this work at home, taking breaks as needed.

Job Title:        Vice President of Education and Community Outreach
Employer:         Planned Parenthood of New Mexico
Dates:            2000-2001
Wages:            Approximately $60,000 per year
Job Duties:       Oversaw statewide Educational Department Programs. Responsible for writing grant proposals and monitoring contracts.
Job Demands:      She typically needed to work 50-60 hour weeks.
Reason for Leaving: Was accepted to the UC Berkeley Graduate Program

0002

Job Title:          Adolescent Pregnancy Prevention Director
Employer:           State of New Mexico, Department of Health
Dates:              1998-2000
Wages:              $45,000 per year
Job Duties:         Responsible for developing and monitoring contacts for
                    statewide comprehensive adolescent pregnancy prevention
                    programs.
Reason for Leaving: A higher salary.


Job Title:          Disease Prevention Specialist
Employer:           State of New Mexico
Dates:              1996-1998
Job Duties:         Development of educational and clinical projects and
                    activities related to the prevention of communicable
                    diseases.


Job Title:          Forensic Toxicology Assistant
Employer:           SED Medical Laboratories
Dates:              1995-1996
Job Duties:         Conducted blood and urine drug analysis. Presented to the
                    community on the effects of drug use.


Job Title:          Health Educator
Employer:           International Health Cooperation Program
Dates:              1994-1995
Job Duties:         Assisted in basic medical care and education.


## TRANSFERABLE SKILLS ANALYSIS

Ms. Romero has conducted international research in Africa, South America, Jamaica, and Mexico. She has attended numerous conferences for professional development. She has two publications which will be published in peer reviewed journals. She has presented papers at professional association meetings and received awards and honors from her professional and academic experiences.

Ms. Romero is fluent in Spanish reading, writing, and speaking. She is computer literate, including statistical and data analysis software.

A more detailed analysis of her additional experience and transferable skills are listed in her Curriculum Vitae.

0003

## PHYSICAL ISSUES

Ms. Romero indicated that her main complaint is her low back condition. She indicated that she was still under treatment for her injury on 12/31/02. She has seen Dr. Randall and Dr. Sachdeva most recently. She conducts home exercise programs three times per week. She participates in acupuncture treatment approximately one time every week. She has massage therapy approximately two times per month. She takes Vicodin as needed to manage her pain. The side effects of this medication are that she becomes "spacey and not as engaged in class work." She tries to take the medication as little as possible, but she still needs it, such as when she over exerts or uses the computer too long. She also takes Celebrex and Tylenol as needed and wears Lidoderm patches, which have no side effects.

In terms of future treatment, she stated that her condition has become chronic and she will need pain management. She stated that she may need replacement surgery or surgery to take out the hardware. She was informed that she could develop arthritis. She stated that she would need to take medication for the rest of her life. She has a high chance of re-injury.

## PSYCHOLOGICAL ISSUES

Ms. Romero indicated that she still occasionally has nightmares about her accident. She had seen a psychotherapist, Ileene Dillon, for a few months after the incident. She stated that she is still very cautious and has a lessened sense of safety. She feels that she cannot do anything without risking injury. She also stated that she has experienced a sense of abandonment after the accident because her boyfriend left their relationship.

## JOB ACCOMMODATIONS

Ms. Romero indicated that she primarily works at her home at the current time. As a result, she is extremely flexible in her work station and time schedule. After working on a computer for 30-45 minutes, she needs to take a rest for 10-15 minutes. She needs to stretch on a ball or lay down. She stated that she cannot lift anything over 20 pounds, even when using proper body mechanics. She typically works just 4-5 hours and by 3:00 or 4:00 in the afternoon, she is not able to work anymore. She becomes very tight if she continues to work, and she stated "I will pay for it later." At the end of the day, she feels extreme fatigue, particularly if she has been working more than 4-5 hours.

She stated that she needed to buy a special ergonomic chair at a cost of $900. She has more flexibility with a laptop computer. However, she still needs a fluctuating table for her regular computer. She uses a step stool and grabber for overhead reaching. She uses a luggage carrier whenever possible.

0004

Ms. Romero stated that she needs flexible hours because she is not always aware when she may exacerbate her condition. Currently, she is just working 20 hours per week at her home. She must lay down on a recliner whenever she exacerbates her condition.

While she was at school in classes, Ms. Romero indicated that she had flexibility in her work station. She had spoken with professors regarding her classroom schedules and need to fluctuate. She had frequent absences and requested other students to take notes for her. Her classmates also helped carry her books. Most of her work was still conducted in her house. The professors allowed a diminished reading list. She also took an independent study to maintain her classes.

Ms. Romero had been on schedule to finish her coursework in Spring 2003, until the injury occurred. She indicated that most of her classmates graduated in May 2004. She stated that she should have graduated at this time as well, but her program was delayed one full year as a result of her accident. She had surgery on 1/09/03, and she recuperated for three weeks. She returned to school because she did not want to lose her fellowship and health insurance. She took only the minimum of four classes, but she experienced a lot of problems. She used a cane and reported that the pain medication affected her concentration. She was not able to take the qualifying exam until September 2003, rather than April 2003. The remaining requirements were also pushed back, including her prospectus, which was the proposal for her dissertation. She lost a year of her fellowship and needed to obtain student loans instead.

## HOUSEHOLD SERVICES ANALYSIS

| Activity | Before Accident | After Accident |
|---|---|---|
| Cooking | 7 hrs. | 3-4 hrs. |

Ms. Romero stated that friends help her with cooking after the accident. She prepares light meal preparations only. She eats frozen foods.

| Shopping | 1-2 hrs. | 1-2 hrs. |
|---|---|---|

However, Ms. Romero indicated that it is hard for her to push a cart. She must carry smaller bags. She can only take 1-2 bags at a time.

| Yard Work | 2 hrs. | 0 hrs. |
|---|---|---|

Ms. Romero indicated that she loves flowers and herbs. She stated if she had a house, she would not be able to do the yard work required.

| Home/Car Repair Maintenance | 0 hrs. | 0 hrs. |
|---|---|---|

Ms. Romero indicated that she had changed her car tires previously, but she typically does not perform home or car repairs.

0005

| Housecleaning/Laundry | 4 hrs. | 1-2 hrs. |

Ms. Romero stated that she cannot scrub her bathtub. She cannot dust high shelves. She cannot perform deep cleaning. She stated that if she does 2-3 loads of laundry, she would be on her back for one hour. She only does small loads of laundry. She also cannot perform vacuuming any longer. She stated that friends help her.

| Totals | 14.5 hrs/wk | 6.5 hrs/wk |

| Differential | 8 hrs/wk |

Ms. Romero was also questioned regarding her future family plans. She stated that she "was absolutely planning on having a family." She stated "now that my school work is over, my priorities are shifting." She expects to have two children by the time she is 40 years-old. She stated that she did not know if she would have any problems during her pregnancy as a result of her physical condition. She stated that she may need bed rest. She indicated that she thought she would need help caring for the child after the birth.

## PRE-INJURY VOCATIONAL PLANS

Prior to the accident, Ms. Romero indicated that she would have been open to employment opportunities anywhere in the world. She stated that there are numerous opportunities with International Health Organizations for people with her level of experience and education. She felt that she would have qualified for management level positions, such as executive director or researcher. She stated that these positions are high-powered in nature which require extensive overtime commitments. She expected to receive a salary of $100,000 per year or more with her Ph.D. and extensive experience.

Ms. Romero listed the following job demands as necessary for these types of executive management positions:

Field Work:       If the job is an international position, lifting and carrying supplies will be required. If working in a rural, undeveloped country, one must sleep on dirt floors. This type of field work would be too strenuous for Ms. Romero, both physically and mentally.

Driving:       Executive positions can involve extensive driving. In more rural or international settings, these positions may require driving four hours at a time. She indicated she becomes "miserable" after driving one hour.

Computer Data
Entry:              These positions involve writing grants, conducting research, providing technical assistance, answering emails, and writing reports. Many of these jobs require computer work for 8-9 hours per day, depending on the nature of the project and project needs.

Lifting/Carrying:   Many of these positions require carrying displays for conferences. She has carried boxes of condoms for health fairs, as well as other equipment and supplies. She has also carried as many as 20 copies of grant proposals.

Bending/Stooping:   It would not be repetitive, but these positions would require filing. If working in the field, there would be bending and stooping to carry equipment and supplies.

Overhead Reaching: She occasionally would need to perform overhead reaching for various activities.

Sitting:            She anticipated that between working on the computer, performing office work, and attending meetings, she would be sitting as much as 9 hours out of a 10-hour day for most executive positions.

Standing:           She would be required to stand for presentations. She is able to stand less than one hour now without increased discomfort.

Walking:            She is able to walk 30-40 minutes, but walking up an incline or decline is more difficult. Walking on uneven ground such as rocks would be unstable for her.

Travel:             There can be extensive travel required in the field of public health, especially in her area of expertise of HIV, AIDS, and Womens' Reproductive Health. She indicated she would have problems taking long trips and carrying her luggage. She stated the longest she has traveled since her surgery was a trip from Oakland to Santa Fe, New Mexico. She needed to take two Vicodin for pain. She felt her opportunities would be severely limited if she was not able to attend conferences in order to network. She does not feel she would be able to perform a job which involved extensive or regular travel. She definitely did not feel she could handle long flights overseas, even if she traveled first class.

| | |
|---|---|
| Driving: | She stated that the most that she could commute to a job would be 30-45 minutes. |
| Work Schedule: | She would need extreme flexibility in her work schedule and work station. She felt that she might be able to handle a part-time job if she had to go to an office. However, she would need a break every 30-45 minutes. She would have difficulty with any job which did not allow her to take breaks as needed. She would prefer a job which would allow her to work at home. |

## POST INJURY VOCATIONAL PLANS

Ms. Romero indicated that she could no longer perform the types of jobs she had planned to pursue following completion of her Doctorate in Public Health. The job demands of these types of positions would be beyond her physical limitations.

In addition, the following vocational options were discussed with Ms. Romero regarding her interest and physical capabilities to perform these types of jobs:

| | |
|---|---|
| - Public Health Service Officer: | She performed this type of work previously at the state level with her Masters Degree. She may be able to do this type of job part-time. She could not be expected to work eight hours or more a day. She would have to set definite boundaries. |
| - Public Health Microbiologist: | "I have a Bachelors of Science Degree in Microbiology and Chemistry, but it is outdated. I have no interest in pursuing this type of work." |
| - Director/Community Organization: | "This type of job would involve extensive hours. I was already a Vice President at Planned Parenthood in New Mexico, with four directors working under me." |
| - Research Director: | "I would like to continue doing research in the social sciences. However, the long hours and computer time expected would be problematic for me." |

| - University Faculty Member: | "I might be able to teach, but it would be a problem if I were to seek a tenured tract position. There is a lot of work in these positions, beyond just teaching. It is very competitive. Adjunct teaching positions pay much less." |
|---|---|
| - Research Worker: | "It would depend on the hours. This is what I am doing for my dissertation. I might be able to do something like this on a part-time or consulting basis." |
| - Project Director: | "I would not need a Ph.D. to perform this type of work. I was overseeing project directors before I entered the Ph.D. program. These types of jobs can be very demanding. I could only do it on a part-time basis." |
| - Fundraising Director: | "I could do some of these job duties. I have done some grant writing. I am not interested in capital development or direct fundraising. I do not feel I would be good at it. I could not do this type of work full-time." |

At the conclusion of the vocational exploration, Ms. Romero stated, "I devoted more than four years of my life to this career. Why did I get a Doctorate if it is not going to help me now? I made so many sacrifices in terms of time and effort to complete my education." She wondered, "Why am I still doing it? I wish I could just stay in school the rest of my life. I could take breaks and work at my own pace. I have done everything: medication, acupuncture, massage, and physical therapy. I cannot control it. I have always set goals and been able to finish them. I feel like I will be seen as damaged goods. The best situation for me may be to work as a consultant part-time out of my home."

On 10/14/04, Ms. Romero indicated that a feasible work situation might be arranged by applying for a post Doctorate position. She stated that "the lure of a post Doc is it's flexibility in terms of hours, work from home, ability to make appointments during the day, etc. It is obviously less pay than I could get from a job, but it would allow me two additional years in a student schedule." Ms. Romero reported that these post Doctorate appointments were available through the prestigious Robert Wood Foundation. She had been selected to interview at two university sites, with only 15 openings available. The position would start in Fall of 2005. The starting salary would be $74,000 per year, increasing to $77,000 in the second year. Health insurance only would be provided.

## WORKER CHARACTERISTICS

Ms. Romero attended the Vocational Evaluation programs punctually, as scheduled. She was noted to be presentable in her appearance, as she was dressed in casual clothing.

Ms. Romero accepted supervision as she participated in the interviewing and Functional Capacity Evaluation testing. She was noted to exhibit social interaction skills as she responded to questions and engaged in social conversations. However, she did become emotional on one occasion. She started to cry when she reported realizing the level of her limitations. She stated "I thought I could lift more. I'm really tired, anxious, depressed, and in pain."

During the first evaluation day, Ms. Romero was observed to stand and take breaks after 30-45 minutes of sitting. She would stand for approximately 10 minutes. On two occasions, she was noted to stretch, and on another occasion, she walked down the hallway for approximately 10 minutes to help ease her discomfort. On the second program day, she took 2 breaks. One time, she laid down, and the other time, she walked and stretched. She was observed to sit for a maximum of 30 minutes and then stand for 15 minutes.

## PRE-INJURY VOCATIONAL ANALYSIS

It is opined that Ms. Romero would have been able to obtain a tenured professor or executive level director position in the Public Health field had she not been injured on 12/31/02.

Ms. Romero had demonstrated an exemplary work history and a high level of academic achievement. She had more than 10 years of work experience, working in international and governmental programs. She specialized in Adolescent and Womens' Reproductive Health and HIV/AIDS policy development, implementation, and research. After obtaining her Masters in Public Health, she attended a prestigious university, well-recognized in the field of Public Health, achieving a GPA of 3.9. Her faculty advisor ranked her in the top 10% of her class. She also co-authored research that has been accepted in peer review journals. She is bilingual in Spanish, and she was open to working anywhere in the world following completion of her Doctorate.

It is clear that Ms. Romero was committed to her career and devoted her time, energy, and resources to achieve her goals of obtaining a management level position or tenured faculty appointment in the field of Public Health. Ms. Romero was on the fast-track to advance in her career.

0010

A Labor Market Survey, attached to this report, was conducted which confirmed Ms. Romero was highly qualified to obtain these types of positions following completion of her Doctorate degree. Job openings were reported to be regularly available for someone with Ms. Romero's background. Her engaging personality would be viewed as a positive attribute by any potential employer. The Labor Market Survey revealed that the average starting salary for someone with Ms. Romero's background would be $96,000 per year to start, increasing to $111,110 per year after 3 years of experience. These wages are also confirmed by labor market research completed by the California Employment Development Department, Occupational Employment Statistics (2004 Data).

In addition, numerous actual job openings were also identified by Ms. Romero as viable positions that she would have been qualified to perform, had she not been injured. These job announcements were obtained from the APHA website, available to the membership. These job announcements were printed on three separate occasions: specifically, 6/25/04, 8/15/04, and 9/16/04. The job openings demonstrated the types of wages and availability of opportunities that were accessible to Ms. Romero prior to her injury, and also confirmed the results of the Labor Market Survey attached to this report.

## POST INJURY VOCATIONAL ANALYSIS

It is opined that Ms. Romero will no longer be able to maintain an executive level position or tenured faculty appointment in the Public Health field, following her injury of 12/31/02. Instead, Ms. Romero's best vocational alternative will be to pursue a half-time consulting position which will allow her to work at home in order to self-pace her work activities as needed. Additionally, following completion of a Work Hardening Program, it is anticipated that Ms. Romero would be able to perform a half-time office-based position that provided her with job accommodations. However, it should be noted that these positions are limited in number and a benevolent employer would need to be identified. Vocational rehabilitation services would be recommended in order to provide her with job development services to locate an appropriate employer, as well as provide her with support through vocational counseling and provision of job-seeking skills.

Ms. Romero has been severely impacted as a result of her injury in terms of her ability to work. Following her surgery, she was able to complete her graduate studies with a significant number of accommodations. However, her expected graduation date was delayed a full year as a result of her reduced productivity during her recuperation.

Currently, Ms. Romero has been most recently diagnosed by her treating physician, Dr. Kulveen Sachdeva, with a L1 burst fracture, chronic pain, and neuropathic pain following her laminectomy surgery. Dr. Sachdeva; in a

telephone contact on 12/09/04, reported the following work limitations for Ms. Romero following her injury:

As Lisa's workday progresses, her symptoms will increase. If she were required to work in a sedentary job for 8 hours a day, she will not physically be able to handle the job. Lisa should not be sitting behind a desk for 8 hours a day. She will need to pace herself, as well as move around as needed. She should change her position for 5 minutes after approximately 20 minutes of sitting. She should be able to fluctuate as needed between sitting, standing, or laying down. Stretching and laying down would be appropriate ways to relieve her discomfort as needed. Otherwise, she will be at risk for exacerbating her pain.

Working on a computer would be more problematic than just working at a desk. The repetitive forward reaching position will put additional stress on her mid-back and further reduce her endurance. She should not work at a computer more than two hours per day, total.

The maximum time she should be standing in a dynamic position is 30 minutes. In terms of walking, she needs to pace herself. A reasonable distance that she could walk without exacerbating her pain would be 4 blocks. She should not perform uphill climbing. Climbing stairs should be performed according to her own tolerance levels.

The maximum amount she should lift and carry is 10 pounds. She should not perform lifting and carrying on a repetitive basis. She should also not perform repetitive overhead reaching or repetitive forward reaching. She should not perform repetitive bending and stooping. Bending, stooping, twisting, and pushing should only be performed on an occasional basis.

It is recommended that she not drive more than one hour a day maximum. In terms of her ability to travel, I would expect that she could handle an international flight on a one-shot basis. However, I would not recommend that she obtain a job which involves air travel on a regular basis.

The best work situation for her would be working half-time in a home-based situation combined with a half-time job working in an office setting which allowed her to fluctuate as needed. It would be a good mix for her. She needs to be able to have some down time and pace herself. Her level of productivity will depend on her ability to follow all of these restrictions in a work setting.

A work hardening program would be able to assist her if she were going to return to an office-based job. The work hardening program would not be helpful if she were to return to a job which involved working in the field.

In terms of her medications, there are no side effects of decreased concentration from her current medications.

In terms of household services, Lisa would need to follow these restrictions and not perform any heavy chores. She would need a personal services worker for these activities. If she were to have a child, she would also need assistance with childcare.

The results of the Functional Capacity Evaluation, conducted at the Center for Career Evaluations on 8/17/04, also confirmed Ms. Romero's limited ability to perform work at her previous levels. Specifically, she exhibited limited sitting and standing tolerances, as she needed to fluctuate between sitting and standing after periods of 20-30 minutes. Her maximum sitting tolerance was noted to be 45 minutes. She needed frequent changes in her positioning with break periods due to prolonged sitting or standing. She was not able to work during these rest periods. She was not able to lift beyond 10 pounds using safe body mechanics. She exhibited decreased lumbar range of motion and was unable to stoop and bend to perform low level activities. Repetitive forward reaching and overhead reaching were also limited due to increased low back pain. She put forth a full and consistent effort throughout the evaluation as confirmed by isometric testing.

The Functional Capacity Evaluation, therefore, revealed that Ms. Romero was currently limited to working at a Sedentary level as defined by the Department of Labor. However, Sedentary work involves sitting most of the time, and Ms. Romero is unable to tolerate prolonged sitting and would need frequent changes in positions. Therefore, the number of Sedentary jobs available to her would be severely restricted.

The Functional Capacity Evaluation also revealed that Ms. Romero would benefit from a comprehensive ergonomic assessment of her work station. Ergonomic equipment was also recommended which will allow her more flexibility to maintain her work station. The cost of this equipment was noted in the Functional Capacity Evaluation Report, dated 9/20/04, submitted under separate cover.

As a result of Ms. Romero's work limitations noted above, it is opined that the labor market available to her has been severely restricted. Additionally, she will have difficulty advancing in her career because she is no longer on the fast-track. She has been limited in the number of job opportunities accessible to her because she will only be able to work in a part-time office setting. She will need to locate an employer that would provide her with accommodations and a flexible work station. She is no longer able to access jobs which involve travel. She also will be limited in the amount of computer operations that she will be able to perform. Additionally, it should be noted that consulting work is not guaranteed which would also affect her projected income.

Ms. Romero also identified positions from the APHA job announcements which she anticipated as possibly being available to her following her injury, given her physical limitations. Fewer positions were noted to be offered, particularly on a part-time basis. Additionally, these job announcements revealed the nature of executive level or technical advisor jobs, such as the long hours expected, extensive travel required, and the amount of computer operations involved.

The CCE Labor Market Survey also confirmed the limited number of job opportunities that would be available to Ms. Romero following her injury. The survey indicated that her expected starting salary for the types of positions she can now physically perform was estimated to be $66,250 per year, increasing to $76,250 per year after 3 years of experience. These wages also correlate with labor market information derived from the California Employment Development Department, Occupational Employment Statistics (2004 Data). The wages that were specified in the APHA job announcements also correlated with the Labor Market Survey results.

## HOUSEHOLD SERVICES ANALYSIS

Given the physical limitations outlined by Ms. Romero's treating physician, Dr. Sachdeva, it is opined that Ms. Romero's ability to perform household services has decreased. Specifically, she no longer can perform the amount of cooking or housecleaning that she had been able to perform prior to her accident. Additionally, it is anticipated she would not be able to perform yard work in the future. The differential between her pre and post accident ability to perform household services is calculated to be 8 hours a week.

0014

## PRE-INJURY VOCATIONAL PLANS

I.    Tenured Professor/Executive Director

|                                                    | **Time**   |
|                                                    |------------|
| A. Complete Doctoral Program<br>in Public Health   | 5/04       |
| B. Job Search Activities                           | 6/04-8/04  |
| C. Obtain Employment                               | 9/01/04    |

      1.  Starting Salary: $96,000/yr.
      2.  After 3 years: $111,110/yr.
      3.  Benefits: Medical, Dental, Retirement
      4.  Wages per CCE Labor Market Survey
         (2005 Data)

0015

## POST-INJURY VOCATIONAL ANALYSIS

I.   Consultant/Health Educator Officer
     (2 Half-Time Positions)

|  |  | Time | Cost |
|---|---|---|---|
| A. | Complete Doctoral Program | 5/05 | |
| B. | Job Development and Counseling Services | 6/05-8/05 | $2340 |
| C. | Work Hardening Program | 8/05 | $6500 |
| D. | Obtain Employment | 9/01/05 | |

        1. Starting Salary: $66,250/yr.
        2. After 3 years: $76,250/yr.
        3. Benefits: None
        4. Wages per CCE Labor Market Survey
           (2005 Data)

RECEIVED JAN 0 6 2005

# *FUNCTIONAL CAPACITY EVALUATION*

## CASE BACKGROUND

Ms. Lisa Romero is a 33-year-old right-handed female who was referred to the Center for Career Evaluations to participate in a Functional Capacity Evaluation on August 17, 2004. The purpose of this evaluation was to obtain current measured and observed physical tolerances.

## MEDICAL RECORDS REVIEW

### 8/10/04, Jeffrey B. Randall, M.D.:

Lisa Romero returned for neurosurgical follow up, having last been seen late last year. She continues to have intermittent aching discomfort in her back, worse with prolonged sitting. She was writing her dissertation and notes that in the afternoon she has enough discomfort that she must stop her work, despite changing positions frequently through the work day. She is using Lidoderm patch, taking Celebrex, and using one Vicodin daily. She continues to see Dr. Tang in Berkeley.

Ms. Romero is showing slow, but definite improvement.

### 8/10/04, Kuleen Sachdeva, M.D.:

Chief Complaint:

With decreased sitting, decreased pain. Lidoderm patch with some relief. Using Celebrex, mini breaks, stretches, more walking and postural changes.

### 6/11/04, Kuleen Sachdeva, M.D.:

Currently doing her own therapy. Is dong different things to decrease pain, but, still in a lot of pain especially when sitting. By end of work day, laying on floor/couch in pain.

Sitting endurance low. Pain radiates up to neck.

Impression: L1 fracture, fusion.

### 5/25/04, Clinical Notes and Diagnosis, Elizabeth Padron Vos:

Back pain better (even with plane travel).

After amount of hours at computer – pain begins.

0017

**6/15/04, Clinical Notes and Diagnosis, Elizabeth Padron Vos:**

Back pain responds well to acupuncture. Still needs pain killer during day if working a lot at the computer.

**4/24/04, Clinical Notes and Diagnosis, Elizabeth Padron Vos:**

Back great for several days after treatment. Has been sitting a lot (this aggravates pain).

Did not ice yet (will ice this weekend).

**3/23/04, Clinical Notes and Diagnosis, Elizabeth Padron Vos:**

1)     L1 burst into spinal column. Surgery.
2)     Titanium rods from T11 to L3 (6 screws).

Still under care of nurse.

Physical therapy.

EMDR for panic attacks (good results).

Sits at computer a lot – stretches every 45 minutes. Constant light/pain at the spine vs. muscles.

If not working or on computer or in car, pain is minimal.

**1/01/03, Vincent Ritson, M.D.:**

Chief Complaint:  Back pain.

History of Present Illness:

The patient is a 31 year-old female who comes in with a chief complaint of back pain. The patient was visiting her boyfriend who has got a 2 story loft apartment with a fire pole coming down. She awoke at about 1:00 in the morning, tried to find the bathroom and fell off from the second floor onto the first floor hitting carpet when she went down with the fire pole.

Diagnoses:

1. Significant lumbar one vertebra fracture with retropulsed fragment requiring surgical stabilization.
2. Neurologically intact.

0018

**1/01/03, Norman Ikemoto, M.D.:**

Impression:

1. Compression fracture of the body of L1, with retropulsion of the posterior-superior aspect of the vertebral body.
2. Linear fracture of the left pars interarticularis and lamina of the L1.

**1/01/03, Todd P. Thompson, M.D.:**

Admission Diagnosis:  L1 fracture.

Jaw surgery more than 15 years ago.

Assessment:

1. L1 Burst Fracture, 3 columns.

Recommendations:

I have recommended the patient undergo an instrumented lumbar fusion for stabilization.

Assessment:

2. Right Ankle Sprain.
3. Urinary Tract Infection.

Recommendations:

Her surgery will be delayed until she is afebrile.

**1/04/03, Todd P. Thompson, M.D.:**

Pre-Operative Diagnoses:

1. Lumbar 1 burst fracture.
2. Intardural tumor.

Post Operative Diagnoses:

1. Lumbar 1 burst fracture.
2. Meningioma.

Procedures:

1. Laminectomy, T12, L1, and resection of intradural tumor.
2. Instrumented infusion with pedicle screws, T-11, T-12, L-2, allograft/autograft.

Surgeons:

1. Todd Thompson, M.D.
2. Gonzalo Chong, M.D. (for intradural tumor resection)

The patient underwent two operations in one setting.

**1/09/03, Todd P. Thompson, M.D.:**

Admission Diagnosis:

L1 burst fracture.

Discharge Diagnosis:

1. L1 Burst Fracture.
2. Intradural Meningioma T12.
3. Pleural Effusion.
4. Urinary Tract Infection.
5. Right Ankle Sprain.

Procedures:

1. Laminectomy of T12, L1 with resection of intradural mass lesion, meningioma (pathology pending).
2. Instrumented fusion T11 to L2.
3. Thoracentesis left chest.

Ms. Romero is a healthy 31 year-old woman who fell through the floor of a second story house where she was staying on New Year's eve. The patient was taken to the Operating Room on 1/04/03 and underwent a T12, L1 laminectomy with resection of the intradural mass lesion. She underwent thoracentesis on 1/07/03. The patient's pulmonary status has continued to improve.

Activity:

The patient's activity is limited to walking with no lifting, no bending. She has an extension brace which she was instructed to wear when out of bed.

0020

**10/10/03, Gordon Tang, M.D., Initial Neurosurgical Consultation:**

Chief Complaint: Follow up, status post lumbar fusion.

History of Present Illness:

Ms. Romero is a 32 year-old female who is a doctoral student at UC Berkeley. The patient underwent operative intervention with a fusion as well as resection of the intradural tumor.

The patient continues to experience back discomfort and a sensation of numbness across her back.

The patient stopped wearing her brace in July and had previously been seeing Dr. Zovickian for follow up care. Due to the fact that Dr. Zovikian has become a Kaiser physician, she is continuing her follow up care here.

Past Medical History:

The past medical history is remarkable for spinal procedure and a jaw operation in 1985.

Impression:

Status post fusion and resection of intradural tumor. The patient continues to improve steadily and has had no evidence of neurologic symptoms.

**12/16/03, Jeffrey B. Randall, M.D., Office Note:**

Lisa Romero returned for follow up and review of her x-rays. She has intermittent stiffness and soreness in the low back, but takes no medications on a regular basis. She is getting ready to do field work for her doctoral dissertation in New Mexico.

Physical exam continues to show good strength and sensation through the lower extremities with symmetric reflexes.

Ms. Romero is doing well. I will plan to schedule her for a final evaluation in six months.

0021

## INITIAL INTERVIEW

Prior to beginning the Functional Capacity Evaluation, an intake interview was conducted with Ms. Romero. She reported the following subjective current physical tolerances.

**Job Status:** Ms. Romero is currently a student working toward her doctorate in Public Health.

**Medications:** Currently takes celbrex twice a day for pain. Also takes vicodin, tylenol, and/or aleve as needed.

**Worsens Pain:** Prolonged sitting, standing on hard surfaces, and lifting.

**Self Care:** Independent

**Sleep:** Occasionally wakes up at night due to pain/discomfort.

**Assistive Devices:** Uses a reacher to assist with picking up objects off the floor. She occasionally uses a back brace.

**Sitting:** Maximum of 45 minutes if she is sitting in a comfortable chair before pain increases.

**Standing:** Able to stand for approximately 20 minutes depending on the type of surface.

**Walking:** Able to walk 30-45 minutes on even surfaces. She has difficulty walking on uneven surfaces and going up/down hills.

**Stairs:** Able to climb stairs. Has difficulty climbing stairs while carrying groceries, etc.

**Lifting/Carrying:** Estimated 20 pounds.

**Driving:** Able to drive, but has difficulty turning to both sides. Ms. Romero reported that she is able to travel by car for approximately one hour at a time. After one hour of sitting in a car, she requires increased pain medications.

**Air Travel:**     When traveling via airplane, she will take pain medications prior to flying. She usually takes a stronger pain medication such as Vicodin for flights that last 2 ½ hours. She also reported having difficulty carrying suitcases and briefcases due to pain. She requires assistance for carrying these items.

## SUMMARY OF RESULTS

### Initial Screening Exam/Active Range of Motion

Active range of motion measurements are reported as percentages of normal (WNL = Within Normal Limits).

Cervical Spine Active Range of Motion: Cervical spine active range of motion were WNL. She did not report any pain or discomfort with cervical spine range of motion.

Lumbar Spine Active Range of Motion:

| | |
|---|---|
| Flexion: | 75% with pain |
| Extension: | 30% with pain |
| Right Lateral Flexion: | 75% with pain |
| Left Lateral Flexion: | 80% |
| Right Rotation: | 30% with pain |
| Left Rotation: | 30% with pain |

Upper Extremity Active Range of Motion: Both upper extremities were WNL. She reported slight tightness in her lower back with shoulder flexion on both sides. No other complaints were noted.

Lower Extremity Active Range of Motion: Both lower extremities were WNL as observed by her ability to squat and kneel. She reported low back pain when standing from a squatting position. She reported occasional aching in the back of her thighs.

### Sitting, Standing, and Ambulation

*Sitting*
Ms. Romero was able to sit for a maximum of 20 minutes continuously in an ergonomic office chair with reported increase low back pain. She had more difficulty with sitting tolerance while performing typing/keyboarding activities. She was observed to shift positions frequently.

*Standing*
Ms. Romero was able to dynamically stand for a maximum of 30 minutes with reported low back pain. She was observed to stretch and grasp her lower back frequently with any prolonged standing.